IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

In re:                       )

                         )     Chapter 11

SURGALIGN HOLDINGS, INC., et al.   )

                         )

                         )

                         )

RYAN MESSNER,            )

                         )     Case No. 23-90731

     Plaintiff(s),          )

                         )     Adversary Proceeding

     v.                 )     Case No. 23-03150

                         )

SURGALIGN HOLDINGS, INC.,    )

                         )

     Defendant(s).        )

United States Courts
Southern District of Texas
F I L E D

FEB 09 2024

Nathan Ochsner, Clerk of Court

**PLAINTIFF RESPONSE TO DEFENDANT'S MOTION TO DISMISS**

Pursuant to the SCHEDULING CONFERENCE held on January 10, 2024, Plaintiff(s), RYAN MESSNER responds to the Defendant's Motion to Dismiss, and to the extent required and/or permitted by this Court hereby moves to amend his original complaint, and provide further clarification regarding the reference of 15 U.S.C. § 78ff in said complaint. Plaintiff also draws contrasts between this action and *Kelly v. JPMorgan Chase Bank, N.A., Civil Action No. 3:12-CV-3374-N-BK*, which was referenced in the SCHEDULING CONFERENCE for consideration.

Plaintiff is aware that 15 U.S.C. § 78ff prohibits Plaintiff to pursue any federal criminal action, since the prosecution of federal criminal offenses falls within the exclusive jurisdiction of the executive branch of the federal government. Plaintiff referenced this statute due to observation based on personal experience[1], and did not mean to insinuate that this court should be conducting

---

[1] United States of America v. Douglas T. Hawkins, United States District Court Eastern District of Kentucky, Case 5:21-cr-00110-KKC-MAS. Mr. Hawkins, an attorney licensed in Kentucky, was an employee of the Law Offices of Walter C. Cox, Jr., Lexington, Kentucky, from 2017-2022 and Plaintiff was also employed by Mr. Cox's law firm, from 2009-2022. Prior to his joining Mr. Cox's law firm in 2017, Mr. Hawkins was also licensed as a financial planner and was involved in a lengthy history of constantly changing entities, very similar to Surgalign's history.   After the Kentucky State Department of Financial Institutions conducted audits of Mr. Hawkins' entities in 2015 and 2017, it made findings that cited civil fraud statutes.

a federal criminal fraud prosecution as referenced in *Kelly v. JPMorgan Chase Bank, N.A., Civil Action No. 3:12-CV-3374-N-BK*.

The Plaintiff's in *Kelly v. JPMorgan Chase Bank, N.A., Civil Action No. 3:12-CV-3374-N-BK* relied on three faulty legal theories in support of their claims, whereas the Plaintiff in this action has included factual support, including but not limited to the fact that a determination had already been made that civil fraud existed, as included in the UNILATERAL RULE 26(f) REPORT SUBMITTED BY DEFENDANT, subsection NATURE AND BASIS OF CLAIMS, wherein The SEC investigated Surgalign between 2015-2019 and reached a settlement resulting in a $2,000,000 civil fine for fraud in 2022, and Plaintiff alleges this pre-existing fraud to be a continuum demonstrated by current management, albeit through their intentional selective disclosure of material facts, with absolutely no change in behavior.

Plaintiff has previously documented, and will expand upon herein, the intentional selective disclosure, false and misleading statements, along with current management's knowledge and non-disclosure of previous fraud, all of which the Plaintiff detrimentally relied upon to make investment decisions.

Plaintiff asks the Court to deny the discharge in bankruptcy of any debtor who has committed any acts of fraud, misrepresentation, deceit, or false pretenses under §523(a)(2).

Comes now RYAN MESSNER, and respectfully opposes the Defendant's Motion to Dismiss. In support of the opposition of said Motion, RYAN MESSNER represents the following:

## I. INTRODUCTION

According to Defendant's Counsel, the Plaintiff fails to state a claim upon which relief can be granted, based on the three reasons cited below:

*First, section 523 dischargeability actions do not apply to corporate debtors.*

---

Eventually, the United States Postal Service Mail Fraud division was brought into the investigation, and the United States subsequently filed criminal charges against Mr. Hawkins. After a jury trial, Mr. Hawkins was found guilty of fraud, involving approximately $2,000,000, as set forth in the Sentencing Memorandum, attached herein as EXHIBIT G. Mr. Hawkins is currently incarcerated in Ashland, Kentucky, serving ten years. Plaintiff does understand that it is the US Attorney who prosecutes criminal violations of Federal statutes. However, when Plaintiff compares the magnitude of the fraud of Surgalign with that of Mr. Hawkins, Plaintiff fails to understand why every single officer and member of management involved in the years of fraud and misrepresentation by Surgalign is not currently incarcerated. To that end, Plaintiff may redirect his concerns about criminal prosecution of Surgalign and its officers and management to the appropriate branches of the Federal government responsible for such prosecution.

*Second, the Plaintiff's securities fraud claim requires dismissal because it fails to plead with particularity.*

*Third, the alleged claims are section 510(b) claims which were cancelled, released, and extinguished under the confirmed Plan.*

The validity of each of the aforementioned reasons will be disputed herein, in addition to the following considerations:

*Counsel's misrepresentation of the Defendant, namely Veronica Polnick of Jackson Walker LLP.*

*Counsel's failure to comply with service regulations based on the Plaintiff's Pro Se status, namely Veronica Polnick of Jackson Walker LLP.*

*Intentional Selective Disclosure exemplified by the Defendant, as defined under Regulation FD.*

*The doctrine of stare decisis.*

## II. SECTION 523 DISCHARGEABILITY ACTIONS

*Defendant's Claim:  Section 523 dischargeability actions do not apply to corporate debtors.*

*Plaintiff's Position:  Section 523 dischargeability actions APPLY to corporate debtors, based on Cantwell-Cleary Co., Inc., v. Cleary Packaging, LLC, as defined below:*

As the Court is aware, Section 523(a)(2)(A) of the Bankruptcy Code provides an exception from the discharge of any debt for money, property or services, to the extent such debt was obtained by false pretenses, a false representation, or actual fraud. 11 U.S.C. § 523(a)(2)(A).

*The following is cited verbatim from "Are Subchapter V Corporate Debtors Subject to the §523(a) Exceptions to Discharge?" (thompsoncoburn.com)*

**Background**

"Congress passed The Small Business Reorganization Act of 2019 (the "SBRA") for small businesses, currently defined as debtors with less than $7.5 million in debt. SBRA created a new Subchapter V, which can be used by both individual debtors or business entities, such as corporations, limited liability companies or partnerships (hereinafter "Business Entities"). While Congress intended to streamline and facilitate small business reorganizations, two recent cases discuss a little-noticed provision of Subchapter V that limits the ability of Business Entities to discharge certain kinds of debts in a Subchapter V plan.

SBRA added section 1192 of the Bankruptcy Code, which discusses a Subchapter V debtor's rights to discharge debts in a Subchapter V plan. This section says that a debtor may discharge debts that arose before confirmation of the plan except debts "of the kind specified in section 523(a) of [the Bankruptcy Code]." Section 523(a), of course, contains nineteen separate subsections describing debts that cannot normally be discharged ranging from debts arising out of domestic support obligations to debts incurred by violating federal election laws. While the majority of the debts described in Section 523(a) are unlikely to arise in a small business case, some of the other kinds of debts described in Section 523(a) occasionally do arise in small business cases: such as the debts obtained by fraud or a material misstatement in a financial statement.

Section 1192's discharge language differs from language in Section 1141(d), which governs discharges in regular Chapter 11 cases (i.e. Chapter 11 cases not filed under Subchapter V). Section 1142(d)(2) says *individual debtors* cannot receive a discharge of debts described in Section 523(a), but is silent on whether Business Entities can receive a discharge of the debts described in Section 523(a), leading the courts to conclude that a Business Entity *may discharge* otherwise non-dischargeable debts in its Chapter 11 plan. But Section 1192's language excepts debts of the kind specified in Section 523(a) from discharge without regard to whether the Subchapter V debtor is an individual or a Business Entity.

Recent cases have grappled with this apparent disconnect between Subchapter V's enhanced reorganization policy and Section 1192's discharge language, which is more restrictive than outside of Subchapter V. A detailed discussion of two such cases follows:

**Fourth Circuit**

In the case of *Cantwell-Cleary Co., Inc., v. Cleary Packaging, LLC*, after Cantwell-Cleary obtained a judgment against Cleary Packaging, Cleary Packaging filed a Subchapter V bankruptcy case seeking to discharge the judgment. However, Cantwell-Cleary filed a complaint against Cleary Packaging seeking a declaratory judgment and arguing that Cleary Packaging cannot discharge the judgment as it fell within one of the exceptions of debts that cannot be discharged under §523(a). In turn, Cleary Packaging argued that as a corporate debtor, the §523(a) exceptions to discharge do not apply to it. While the bankruptcy court agreed with Cleary Packaging and dismissed the action finding that the exceptions do not apply to corporate debtors because of the limiting language in §523(a), the Fourth Circuit reversed and held that the §523(a) exceptions to discharge apply to corporate debtors in Subchapter V cases.

The Fourth Circuit relied on many arguments in reaching its conclusion. The court reviewed the statutory language and the interplay between §523(a) and §1192 and stated that while §1192 provides for the discharge of debts for both individual and corporate debtors, the question remains as to whether the introductory language in §523(a) limits the exceptions to discharge to individual debtors. The court focused on the language of the statutes and noted that §1192(2) excepts from discharge any debt of the kind specified in §523(a), but does not specifically reference the kinds of debtors, as §523(a) explicitly does. Therefore, the court found that "the debtors" covered by the language of §1192(2), which includes both individual and corporate debtors, are not exempt from the "kinds of debt" listed in §523(a).

Additionally, the court referenced that the language in Chapter 12 is virtually identical to the language included in §1192(2) and that courts, in interpreting that language, have concluded that the discharge exceptions apply to both individual debtors and corporate debtors. To interpret the same language elsewhere in the Bankruptcy Code in a different manner would lead to an inconsistent result.

Lastly, the Fourth Circuit believed that allowing the discharge exceptions to apply to both individual and corporate debtors in Subchapter V would comport with the purpose behind Congress' creation of Subchapter V. Congress aimed to simplify Chapter 11 reorganizations for small business and reduce administrative costs for those businesses. In doing so, the purpose was to provide similar benefits to individuals and also to corporations. Thus, adopting Cleary Packaging's interpretation of the issue and treating the two types of debtors differently would frustrate that purpose.

### Western District of Texas Bankruptcy Court

Several months later, a bankruptcy court for the Western District of Texas, disagreed with the Fourth Circuit's reasoning. In *Avion Funding, LLC v. GFS Industries, LLC,* Avion Funding initiated an adversary proceeding against GFS Industries, which was in bankruptcy, stating that GFS Industries failed to disclose to Avion Funding's affiliate that a bankruptcy filing was imminent when it was seeking funding from such affiliate and thus the debt GFS Industries owes to Avion should be deemed non-dischargeable.

The court sided with the debtor GFS, and held that Avion's claims under §523(a) must be dismissed because §523(a) only applies to individual debtors, not corporate debtors. Unlike the Fourth Circuit, this bankruptcy court interpreted the introductory preamble to §523(a) in a way that limits the applicability of the exceptions solely to individual debtors. It stated that although on its face §1192(2) seeks to incorporate the list of debts that are deemed non-dischargeable without regard to the type of debtor, the preamble to §523(a) is critical to the analysis as it contains language limiting discharge to only individual debtors. Further, by amending §523(a) and adding reference to §1192 into the preamble, the intent was to treat discharges pursuant to §1192 similar to all other discharges under Chapter 11. The court found that §1192(2)'s reference to §523(a) only incorporates the list of non-dischargeable debts without expanding it, and as such §1192(2) is not intended to except from discharge any debts that §523(a) does not already except and does not empower §523(a) to cast a wider net than the text permits.

In addition, the court noted that if Congress intended to exempt corporate debtors from discharge of the debts listed in §523(a), it could have done so similarly to the express exemption in §1141(d)(6) to corporate debtors. The court stated that when Congress drafted §1192(2), it knew how to distinguish dischargeability based on the type of debtor and did not make such distinction in §1192(2). Thus, courts must look to the language of §523(a) which applies solely to individual debtors.

Further, the bankruptcy court reiterated that in creating Subchapter V, Congress intended to expand, not discontinue, the principles of Chapter 11 and since Subchapter V is a subset of Chapter 11, courts should not depart from the well-established principle that corporate debtors

are not subject to the §523(a) exceptions to discharge. The fact that the language of §1192 is similar to that of language in Chapter 12 does not provide reason to treat Chapter 11 cases as if they are Chapter 12 proceedings. Chapter 12 provides broad language because that is consistent with Congress' intent to provide special treatment for certain kinds of debtors. Chapter 12 cases have unique considerations not present in Chapter 11 cases and thus courts are not mandated to extend Chapter 12 interpretation to Chapter 11 cases, despite similar language.

On February 3, 2023 the bankruptcy court granted Avion Funding's motion to certify its order for direct appeal to the Fifth Circuit. The question that will be presented on appeal will be whether corporate debtors proceeding under Subchapter V of Chapter 11 may be held liable for claims under 11 U.S.C. § 523(a). If the Fifth Circuit affirms the bankruptcy court it will create a circuit split between the Fourth and Fifth Circuits which are the only two Circuit Courts to consider this issue. Several recent bankruptcy court decisions have reached the same conclusion as the bankruptcy court in Avion Funding. See *Jennings v. Lapeer Aviation, Inc. (In re LaPeer Aviation, Inc.)*, Adv. No. 22-03002, 2022 Bankr. LEXIS 1032, 2022 WL 1110072 (Bankr. E.D. Mich. Apr. 13, 2022); *Catt v. Rtech Fabrications, LLC (In re Rtech Fabrications, LLC)*, 635 B.R. 559 (Bankr. D. Idaho 2021); *Gaske v. Satellite Rests. Inc. (In re Satellite Rests. Inc.)*, 626 B.R. 871 (Bankr. D. Md. 2021)."

*End of citation from "Are Subchapter V Corporate Debtors Subject to the §523(a) Exceptions to Discharge?" (thompsoncoburn.com)*

*Thompson Coburn's Financial Restructuring group is well versed in all of the nuances and developing caselaw surrounding the SBRA. Katharine Clark currently serves as a panel Subchapter V Trustee for the Bankruptcy Court for the Northern District of Texas. Joseph Orbach has served as counsel to Debtors and Creditors in Subchapter V cases.*

## Summary

The interpretation of discharge language, in conjunction with the "silence" on whether Business Entities can receive a discharge of the debts, has provided a "split" in recent Court decisions, as outlined below:

### *Cantwell-Cleary Co., Inc., v. Cleary Packaging, LLC,*

> *"While the bankruptcy court agreed with Cleary Packaging and dismissed the action finding that the exceptions do not apply to corporate debtors because of the limiting language in §523(a), the Fourth Circuit reversed and held that the §523(a) exceptions to discharge apply to corporate debtors in Subchapter V cases."*

### *Avion Funding, LLC v. GFS Industries, LLC*

> *"The court sided with the debtor GFS, and held that Avion's claims under §523(a) must be dismissed because §523(a) only applies to individual debtors, not corporate debtors."*

> *"On February 3, 2023 <u>the bankruptcy court granted Avion Funding's motion to certify its</u> <u>order for direct appeal to the Fifth Circuit</u>. The question that will be presented on appeal will be whether corporate debtors proceeding under Subchapter V of Chapter 11 may be held liable for claims under 11 U.S.C. § 523(a). If the Fifth Circuit affirms the bankruptcy court <u>it will create a circuit split between the Fourth and Fifth Circuits</u> which are the only two Circuit Courts to consider this issue."*

Plaintiff believes that the "silence" on whether Business Entities can receive a discharge of the debts, combined with the granted motion for direct appeal, speaks volumes, and Plaintiff therefore moves the Court to deny the discharge in bankruptcy of any debtor who has committed any acts of fraud, misrepresentation, deceit, or false pretenses under §523(a)(2).

## III. PLEADING WITH PARTICULARITY

*Defendant's Claim: The Plaintiff's securities fraud claim requires dismissal because it fails to plead with particularity.*

*Plaintiff's Position: The Plaintiff's securities fraud claim proves malice, intent, and previous knowledge by current management and does not qualify for the Defendant's request of dismissal due to failing to plead with particularity.*

Plaintiff agrees with Defendant's Counsel that pleading with particularity means to include specifics and details, not just general statements, all of which have been previously provided by the Plaintiff, and will be elaborated upon herein.

Attention has been deflected away from the fact that current management's previous knowledge of, direct involvement with, and intentional omission of a "material" press release, namely the SEC accounting fraud investigation commencement in March 2020, misrepresented and omitted critical information that investors use to make decisions. An omitted piece of information is considered "material" if knowing the information would have caused the Plaintiff to reconsider the decision to make the investment. The Defendant's misrepresentation and omission proximately caused the Plaintiff's financial loss.

Cornell Law School defines Securities Fraud simply as the misrepresentation or omission of information to induce investors into trading securities, expanded upon at *https://www.law.cornell.edu/wex/securities_fraud,* thus the basis for the Plaintiff's complaint.

Pursuant to the Private Securities Litigation Reform Act ("PSLRA"), and expanded upon in *PUBLIC LAW 104–67—DEC. 22, 1995 109 STAT. 737,* a Plaintiff instituting a securities fraud action under the Securities Exchange Act must "specify each statement alleged to have been misleading; the reason or reasons why the statement is misleading; and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." Misleading statements, and the reasoning for each, will also be elaborated upon herein.

The hyperbolic statements, lack of communication, misrepresentations, and omissions constituting fraud by the Defendant are detailed herein, described with particularity, and substantiated *inter alia* with company press releases. The Defendant should not be excused for the breach of fiduciary duty, unjust enrichment, and waste of corporate assets demonstrated, including, but not limited to the following:

## Multiple LLC's:

Multiple shell companies and LLC's, some of which were domestic and some foreign, intentionally obfuscated the corporate structures in order to create confusion for investors, not allowing them to keep track of who owned what assets, and when, and what individuals were involved with which companies.

## Hardware Sale:

Total revenue for the three months ended March 31, 2023 was $16.7 million, or $66.8 million estimated over the next 12 months. During the final earnings call, CFO David Lyle revised the next 12 months estimate to be approximately $50 million per year, which took into account the recent $17 million sale of Coflex and Cofix hardware to Xtant Medical Holdings.

Xtant Medical Holdings was the only bidder (stalking horse) at auction and paid $5 million total, plus "assumed liabilities," in an all-cash transaction. The amount and scope of "assumed liabilities" was never disclosed by the Defendant, and therefore cannot be included in the following regarding the questionable sale of the remaining hardware inventory.

According to MedPac in its June 2017 Report to the Congress: Medicare and the Health Care Delivery System report, "large medical device companies are consistently profitable and typically have profit margins of 20 percent to 30 percent." Assuming a conservative 20% margin on the reduced $50 million per year in hardware sales aforementioned, the Defendant's hardware portion of the business would have generated approximately $10 million in profit, with approximately $40 million in cost.

Based on the documented $17 million sale of Coflex and Cofix which was immediately removed from the 12-month top line sales estimate of $66.8 million, reduced down to $50 million, almost on a dollar-for-dollar basis, Plaintiff questions the stalking horse agreement with Xtant Medical Holdings, and whether it was completed in good faith, with all parties best interests being taken into consideration. The Defendant sold Coflex and Cofix for $17 million to Xtant Medical Holdings, while they received a TOTAL of $5 million from Xtant Medical Holdings for the remaining hardware inventory, worth upwards of $50 million in 12-month estimated top line sales, as disclosed by CFO David Lyle.

## Digital Asset Sale and Hiring of HOLO SA Defendants:

On September 29, 2020, the Individual Defendants in the previously disclosed *Fizan v. Surgalign Holdings, Inc. case*, through Roboticine, sold all of Roboticine's interest in Holo Inc. to Surgalign Holdings for $125 million (the "Stock Purchase Agreement"). The itemized purchase price consisted of: (1) a cash payment of $30 million; (2) 6,250,000 shares of Surgalign's stock

with a total value of approximately $12 million; and (3) potential earn-out payments totaling $83 million. The transaction closed on October 23, 2020. After closing of the transaction, Surgalign Holdings hired and appointed Defendant Dr. Kris Siemionow as Chief Medical Officer, Defendant Mr. Paul Lewicki as a non-executive director, and Defendant Mr. Christian Luciano as Vice President of Research and Development and Digital Surgery. The Plaintiffs in the *Fizan v. Surgalign Holdings, Inc.* case believed Surgalign Holdings colluded with the other Defendants to keep Plaintiffs "in the dark" with respect to the transaction, while enticing investors to invest large sums of money 8 years prior.

A non-executive director and Defendant in the *Fizan v. Surgalign Holdings, Inc. case*, namely Paul Lewicki, had disagreements with current management on the future vision for the company and the HOLO implementation, and was promptly released from the Company and Board of Directors, against his wishes. Comparable to the The *Fizan v. Surgalign Holdings, Inc.* case, CURRENT management left investors of the company "in the dark" in regards to what disagreements Mr. Paul Lewicki had with them, similar to the alleged misleading actions of the other Defendants in the *Fizan v. Surgalign Holdings, Inc. case,* namely Defendant Dr. Kris Siemionow and Mr. Christian Luciano, who remained employed with the company after the release of Mr. Paul Lewicki from the Board of Directors.

The fact that investors were left totally "in the dark" regarding the reasoning for the release of Mr. Paul Lewicki, combined with the fact that the alleged misleading actions of the Defendants were never publicly disclosed upon their hiring, initiated a series of trust issues between the Defendant and the investment community, thus affecting the Defendant's ability to secure funding moving forward. Relationships matter, and when trust is broken, relationships are broken.

The lack of ability to obtain necessary funding, as a direct result of being untrustworthy and dishonest, caused the Defendant to liquidate its hardware inventory at a loss to remain solvent.

HOLO was originally acquired for $125 million, only to be sold to Augmedics for $900,000.

## Inducement Grants, Unjust Enrichment, and Waste of Corporate Assets:

The Defendant utilized Inducement Grants to attract new employees under Nasdaq Listing Rule 5635(c)(4), at least 6 (six) times, as disclosed in press releases. The company was not able to provide tangible benefits to new lower-level employees, and knew that these Inducement Grants would be worthless in a matter of time due to unpublicized legal matters forthcoming. Yet, they attempted to attract new employees in this manner, instead of taking advantage of the Federal PPP program (during COVID-19), like 179 other public companies did during that timeframe. The Federal PPP program would have protected their employees, and in turn, long term shareholders, by not having to dilute the value of our shares to cover salaries and other expenses. The company would have qualified for the PPP program since they were under the 500-employee threshold, unless they did not qualify due to the open SEC investigations and other pending legal issues.

Meanwhile, unjust enrichment was granted to upper management.  The company guaranteed CFO David Lyle a 12-month salary upon hiring him, even if another transaction would affect his employment with the company, as noted in the terms of his hiring below:

> *"In connection with his appointment, the Company entered into an Employment Agreement with Mr. Lyle (the "Employment Agreement"), effective March 1, 2022. Pursuant to the terms of the Employment Agreement, Mr. Lyle shall receive an annual salary of $425,000 and shall be eligible to participate in an annual discretionary bonus program pursuant to the Company's annual bonus plan (the "Bonus Plan"). Under the Bonus Plan, Mr. Lyle shall be eligible to receive a short-term incentive bonus of up to 65% of his salary. The exact amount of the bonus payable under the Bonus Plan shall be determined based on the achievement of applicable performance metrics. In addition, beginning with the 2022 plan year, Mr. Lyle will be eligible to participate in the Surgalign Holdings, Inc. Long-Term Incentive Plan (the "LTIP"), under which Mr. Lyle will be eligible to receive an equity award valued at no less than 50% of Mr. Lyle's annual salary. The payment and performance metrics under the Bonus Plan and the LTIP are subject to review by the Board on a periodic basis. Mr. Lyle will also be entitled to a sign-on equity award in March 2022 of 1,200,000 restricted stock units on the date that he becomes Principal Financial Officer (the "Sign-On RSUs"). Such award will be detailed in a separate award agreement that Mr. Lyle will receive after the award is made. The Sign-On RSUs will vest as follows: One third will vest on the first anniversary of the grant date and one eighth of the remaining Sign-On RSUs will vest quarterly beginning on the fifteenth month following the grant date, provided Mr. Lyle is still an employee of the Company on such vesting dates. Mr. Lyle shall be entitled to participate in all benefit programs that the Company establishes and makes available to its management employees."*

> *"Pursuant to the terms of the Employment Agreement, Mr. Lyle is entitled to receive an amount equal to his annual base salary, and to the extent applicable, a COBRA reimbursement amount, if his employment is terminated in connection with a change in control, or if he is terminated without cause or with good reason, as such terms are defined in the Employment Agreement."*

## Management Website Biographies:

The website biographies overly emphasized the following points to mislead the Plaintiff, among other investors, into believing that the management team was fully competent, highly experienced, and understood digital surgery and the future of AI/AR.

> *Exaggerated experience to promote competency in the spine industry, including but not limited to strong surgeon relationships, peer-reviewed publications, U.S. patents, and merger & acquisitions, specifically for small to medium-sized public companies*

*Overly-emphasized and embellished "mergers & acquisitions" to entice potential investors, including the Plaintiff, into believing a future merger or acquisition was on the horizon, and that the "correct" management team was in place to guide them through such a transaction with their alleged past experience*

*Utilized technology buzzwords, large corporation names, and prestigious University names to increase public perception and confidence in management*

The over-emphasis on these alleged past successes and achievements of management (underlined for clarity below), ironically mirrors their TOTAL failures while at Surgalign. The ENTIRE management team EITHER totally failed in execution, OR these alleged past successes and achievements were embellished to entice and intentionally mislead potential investors when doing their due diligence on the company.

**Terry Rich Biography, obtained from Surgalign.com, and attached herein as part of EXHIBIT A, pages 1-2**

*"Terry Rich is President and Chief Executive Officer for the Company. Terry has a proven track record of leading global businesses, driving sales execution and building commercial organizations to drive growth. Prior to joining the Company, he led the turnaround of Alphatec Spine from December 2016 through December 2018. As a director and CEO, he strengthened the organization's competencies, redirected the portfolio with 12 new products and laid the foundation for focused innovation and growth. Prior to Alphatec Spine, Terry was President of Upper Extremities at Wright Medical Group, N.V. Terry has held sales leadership positions at Tornier, NuVasive and DePuy Spine earlier in his career."*

**David Lyle Biography, obtained from Surgalign.com, and attached herein as part of EXHIBIT A, pages 3-4**

*"David Lyle joined the company in March 2022 as Chief Financial officer with fourteen years of public company CFO experience and more than 25 years of experience in technology markets. David has an established track record in successfully scaling high growth technology companies, having served in leadership roles in both public and private organizations. Prior to joining Surgalign, he was the CFO of Airgain, a publicly traded wireless communications systems company. Prior to joining Airgain, David was the CFO of Sunniva, Inc., and before Sunniva, he was CFO at Maxwell Technologies, Inc. for four years, which was acquired by Tesla in 2019. He also served as the CFO of Entropic Communications, Inc., which was acquired in 2015 by MaxLinear. Prior to Entropic, David served as the CFO of RF Magic, acquired by Entropic in 2007, Zyray Wireless, acquired by Broadcom in 2004, and Mobilian, acquired by Intel in 2003. He also has prior work experience in the commercial banking industry.*

*David holds a Bachelor of Science in Business Administration from University of Southern California, a Master of International Management from the Thunderbird*

*School of Global Management, and a Master of Business Administration from Arizona State University."*

**Marc Mackey Biography, obtained from Surgalign.com, and attached herein as part of EXHIBIT A, pages 5-6**

*"Marc Mackey is Executive Vice President of Digital Surgery for the Company. He leads the company's efforts to deliver on the promise of digital surgery. Marc has more than 25 years of orthopedic and surgical-enabling technology experience across the spectrum of business functions, including product development and strategic marketing, business development, corporate strategy, technology innovation, and <u>post-acquisition portfolio integration</u>. He spent more than 20 years at Brainlab, leading the orthopedic division <u>prior to its acquisition by Smith+Nephew in 2019</u>. When that acquisition closed, Marc led the integration and assumed leadership of the digital surgery and robotics division. He began his career as a life sciences research engineer in the space shuttle program and started his medical device career in sales of neurosurgical robotics. Marc holds a Bachelor's degree in Aeronautical and Astronautical Engineering from Purdue University and a Master's in Bioengineering from the University of California, San Diego."*

**Suzanne Zoumaras Biography, obtained from Surgalign.com, and attached herein as part of EXHIBIT A, pages 7-8**

*"Suzanne Zoumaras is Chief People Officer for the Company. She has more than 20 years of experience leading people and driving organizational value by aligning business strategy, culture, and people practices. Most recently, Suzanne served as Principal and Co-founder of Human Capital Resource Partners, providing deep domain and management expertise to <u>companies experiencing high growth or significant change</u>. Prior to that, she was Executive Vice President & Chief People and Places Officer for Arena Pharmaceuticals. Previously, she held executive leadership roles with multiple public and private companies, including Teradata, Atmel, Entropic Communications, and Biosite (now part of Abbvie). Suzanne began her career working for a private investment banking/venture capital firm. She received her Bachelor of Science in Business Administration (emphasis Finance) from San Diego State University and her Certificate in Human Resources Management from the University of California, San Diego."*

**Bryan Cornwall Biography, obtained from Surgalign.com, and attached herein as part of EXHIBIT A, pages 9-10**

*"G. Bryan Cornwall, PhD, MBA, PEng joined the Company in June 2020 as Executive Vice President, Research and Clinical Affairs. Bryan brings his 25 years of clinical operations and research experience in the medical device industry from the University of San Diego's Shiley-Marcos School of Engineering, where he was an Associate Professor of Mechanical Engineering. His experience driving innovation through scientific*

*competence within the spine industry, combined with <u>his strong surgeon relationships,</u> will aid the continued development of Surgalign's global spine portfolio with a focus on clinical differentiation. He is well-published with <u>more than 24 peer-reviewed publications, 24 U.S. patents and eight book chapters.</u> Bryan previously held leadership roles in his 12-plus-year tenure at NuVasive, including President SOLAS & NSF, Senior Vice President of Clinical Operations & Research, Senior Vice President of Research & Clinical Resources, and Vice President of R&D, as well as leadership roles at MacroPore Biosurgery and DePuy-ACE."*

**Paolo Amoruso Biography, obtained from Surgalign.com, and attached herein as part of EXHIBIT A, pages 11-12**

*"Paolo Amoruso is Chief Legal Officer and Corporate Secretary for the Company. He has 25 years of experience serving public companies in various legal, financial, and executive roles. Paolo began his career with Shell Oil Company as a Tax Attorney, served as Assistant General Counsel to the International Division of Devon Energy Corporation, and as Vice President of Legal and Commercial Affairs and Corporate Secretary of Hyperdynamics Corporation. In2016, he joined McGowen & Fowler PLLC, a boutique energy law firm specializing in corporate transactional matters, litigation and <u>mergers and acquisitions for small- to medium-sized public companies.</u> While with McGowen & Fowler, he was brought in by the Board of Attis Oil and Gas (a UK-AIM listed company) to serve as General Counsel and Executive Chairman of the Board, where <u>he led the restructuring and the subsequent reverse merger with HeliumOne Global Ltd.</u>*

*Paolo holds a Juris Doctorate, Master of Business Administration, and Bachelor of Science in Economics from the University of Houston and a Master in Tax Law from the NYU School of Law"*

**Enrico Sangiorgio Biography, obtained from Surgalign.com, and attached herein as part of EXHIBIT A, pages 13-14**

*"Enrico Sangiorgio was named Vice President and General Manager, International in June 2017. Enrico brings 20-plus years of diverse commercial and leadership experience building effective teams and driving international expansion. His expertise includes experience in sales, marketing, business development, general management, and <u>mergers and acquisitions in multiple geographies covering medical devices, pharma, biotech, consumer health and digital health solutions.</u>*

*Prior to joining the Company, Enrico led new business development for women's health and urology in the Europe, Middle East and Africa (EMEA) region at BARD Medical, in continuation of his work as head of distributor markets EMEA at American Medical Systems (AMS)/Boston Scientific. Prior to AMS, he was Vice President of Business*

*Development at Evofem BioSciences covering international markets. Earlier in his carrier, he was Vice President of Global Sales and Marketing at WCG, European brand leader at Astellas Pharma and marketing lead at Merck and Co.*

*Enrico earned a Master of Science in development economics from the SOAS University of London and a Bachelor of Science in business administration from the LUISS Business School in Rome."*

## PRIMARY OMISSION:

The current management team repeatedly attempted to deflect responsibility for its own Intentional Selective Disclosure regarding material events, defined herein in Section VII below, by placing blame on former management, not only in the August 3, 2022 press release excerpt below as underlined, but also in earnings calls, AFTER the SEC investigation was completed in August of 2022:

"This investigation and the settlement reached stems from the activities of RTI and former senior management, <u>not our current team</u>. Reaching this settlement with the SEC will allow us to move forward without this uncertainty and is one more issue resolved in our effort to transform the company since we divested the RTI OEM business roughly two years ago," said David Lyle, Chief Financial Officer of Surgalign. "We believe we are now at the tail end of our transformation and are excited about the prospects of returning to growth in 2023 through new spine product offerings and the ramp of our HOLO Portal Surgical Guidance System coupled with the expansion of our AI platform."

In March 2020, the SEC notified current management of the pending investigation against former management of RTI. Current management's first-hand knowledge of said investigation, combined with their intentional act of not disclosing this material event in the form of a press release, proves malice and their intent to mislead potential investors, including the Plaintiff.

## MISLEADING STATEMENTS:

### *Defendant Statement #1:*

### *"10-15 sites up and running by year-end and we are in discussions with approximately 20 additional potential sites."*

CEO Terry Rich made the following misleading statement on numerous occasions, both in PR and during earnings conference calls:

*"10-15 sites up and running by year-end and we are in discussions with approximately 20 additional potential sites."*

According to the press release issued on May 05, 2022, attached herein as part of EXHIBIT B, pages 1-2, with the following excerpts incorporated herein:

Indiana Spine Hospital is the FIRST to utilize the HOLO Portal system.

"In January 2022, the Company received U.S. Food & Drug Administration (FDA) 510(k) clearance for the Portal system's use within lumbar spine procedures, and today, announced commencement of clinical use. <u>The Company has now moved into its limited market release and intends to ramp up its site locations.</u>"

"It's an absolute honor to work with Indiana Spine Hospital and Dr. Brkaric on the <u>first clinical adoption</u> of our HOLO™ AI technology," said Terry Rich, President and CEO of Surgalign. <u>"This is truly a foundational step in our new digital phase as we launch the first of many planned AI technologies in our roadmap."</u>

According to the press release issued on May 10, 2022, attached herein as part of EXHIBIT B, pages 3-6, with the following excerpts incorporated herein:

<u>"I'm pleased to report that during the first quarter, we began to see market conditions improve with fewer COVID-related restrictions in place, and higher demand for our products as a result.</u> With the improved environment, we now expect higher revenue for 2022 than our prior forecast with opportunities to further grow product revenue as we continue to innovate and expand," stated Terry Rich, President and Chief Executive Officer of Surgalign Holdings.

"This past week, we reached another major milestone with our first site up and first successful <u>cases</u> completed using our HOLO Portal. We expect more sites to be launched this quarter and <u>our goal remains to have between 10-15 sites up and running by the end of the year with a more widespread launch in 2023."</u>

According to the press release issued on July 6, 2022, attached herein as part of EXHIBIT B, pages 7-8, with the following excerpts incorporated herein:

Orthopaedic Institute of Ohio is the SECOND to utilize the HOLO Portal system.

"This is <u>the first clinical application</u> of Surgalign's HOLO™ AI digital health platform."

"The Company is currently expanding the system's limited market release and <u>intends to ramp up its site locations throughout the year."</u>

"Congratulations to Dr. St. Clair for completing the first surgical case in Ohio with the Surgalign HOLO Portal system," said Terry Rich, President and CEO of Surgalign. "We couldn't be more pleased with the performance of our HOLO Portal system to date, and <u>the surgeon excitement generated by the technology is palpable. We believe to be on the cusp of something special here at Surgalign</u> and look forward to bringing the benefit of HOLO Portal technology <u>to thousands more patients to come."</u>

According to the press release issued on August 9, 2022, attached herein as part of EXHIBIT B, pages 9-12, with the following excerpts incorporated herein:

> "We've made significant progress in bringing new products to market while building a strong foundation for the future," stated Terry Rich, President and Chief Executive Officer of Surgalign Holdings. "We expanded the reach of our HOLO Portal Surgical Guidance System, with successful cases performed in Indiana and Ohio, and we are close to securing additional sites throughout the United States. Our plan remains to have between 10-15 sites up and running by year-end and we are in discussions with approximately 20 additional potential sites."

> "Mr. Rich continued, "Our focus near-term is on the commercialization of the HOLO Portal system, integrating procedural technologies, and expanding our HOLO™ AI Platform capabilities. Concurrently, we will continue to build out our engineering capabilities, bring new products to market, and leverage our distribution to expand spine product sales globally. The new products we have launched are gaining traction and there is a lot of excitement building at Surgalign. We believe we are well positioned for growth in the second half of the year, particularly in the fourth quarter, with significantly greater prospects in the future."

According to the press release issued on September 8, 2022, attached herein as part of EXHIBIT B, pages 13-14, with the following excerpts incorporated herein:

> "The Society for Minimally Invasive Spine Surgery ("SMISS") will be hosting its Annual Forum on September 29 – October 1, 2022, at the Bellagio in Las Vegas, NV."

> "The Company will also be participating in the MISS Track Cadaveric Lab on September 29[th] and for the first time at any industry event, will be featuring its HOLO Portal™ Surgical Guidance System with live, hands-on demonstrations."

> "The North American Spine Society ("NASS") will be hosting its 37th Annual Meeting on October 12-15, 2022, at McCormick Place-West Building in Chicago, IL."

> "The Company will also be showcasing its HOLO Portal Surgical Guidance System in its booth."

> "and we look forward to showcasing many of our innovations at SMISS and NASS in the coming weeks," stated Terry Rich, President and CEO of Surgalign. "We're especially excited to debut the HOLO Portal system at industry events as we move forward in our commercialization initiatives and expand our reach."

According to the press release issued on September 15, 2022, attached herein as part of EXHIBIT B, pages 15-16, with the following excerpts incorporated herein:

> Beacon Orthopedics is the THIRD to utilize the HOLO Portal system.

"The Company is currently expanding the system's limited market release and <u>intends to</u> <u>further increase site locations throughout the year.</u>"

"Congratulations to Dr. Chunduri for completing his first surgical case with the Surgalign^TM HOLO Portal system," said Terry Rich, President and CEO of Surgalign. "<u>The performance to date of the HOLO Portal system and the surgeon excitement</u> <u>generated by the technology have validated our high expectations.</u> We believe that our HOLO AI technology will transform patient outcomes, and we couldn't be prouder to partner with Dr. Chunduri."

According to the press release issued on November 2, 2022, attached herein as part of EXHIBIT B, pages 17-21, with the following excerpts incorporated herein:

"During the third quarter, we continued to make progress in bringing new products to market and <u>made significant inroads in the commercialization of our HOLO Portal</u> <u>surgical guidance system with two new sites and several procedures performed</u>," stated Terry Rich, President and Chief Executive Officer. "<u>Demand for HOLO Portal is</u> <u>increasing, but we have experienced delays in contracts and procedures due primarily to</u> <u>ongoing staffing challenges at hospitals in the U.S. As such, we believe we will hit our</u> <u>target of 10 to 15 sites by the end of the first quarter of 2023, with further expansion</u> <u>planned thereafter.</u>"

According to the press release issued on December 13, 2022, attached herein as part of EXHIBIT B, pages 22-23, with the following excerpts incorporated herein:

OrthoVirginia is the FOURTH to utilize the HOLO Portal system.

"The Company is pleased to report that <u>multiple cases have been successfully</u> <u>performed in Virginia leveraging the HOLO Portal system,</u> with the first case performed by Joshua P. Herzog, MD, a board-certified orthopedic spine surgeon with OrthoVirginia in Richmond, Virginia."

"This is the <u>first clinical application</u> of Surgalign's HOLO™ AI digital health platform."

"The Company is currently working to expand the system's limited market release and intends to <u>further increase its site locations throughout the year.</u>"

"Terry Rich, President and CEO of Surgalign, added, "Congratulations to Dr. Herzog and the team at OrthoVirginia for completing the <u>first clinical case</u> in Virginia with the Surgalign HOLO Portal system. <u>The performance of the system to date coupled with</u> <u>the positive surgeon feedback generated by the technology, continues to validate our</u> <u>high expectations and drive our overall goal to transform patient outcomes with our AI</u> <u>technology.</u>"

According to the press release issued on March 2, 2023, attached herein as part of EXHIBIT B, pages 24-25, with the following excerpts incorporated herein:

> Medical City Frisco is the FIFTH to utilize the HOLO Portal system.

> "The last procedure was performed by Dr. Ripul Panchal, DO, a board-certified, fellowship-trained neurosurgeon with expertise in the management of spinal disorders."

> "While the sales process has proven to be longer than anticipated, our pipeline continues to grow, and we have gathered insights from the medical community which will in turn, improve system functionality."

> "Five medical facilities have utilized HOLO Portal since May 2022 and there have been over 30 cases performed to date."

According to the press release issued on May 8, 2023, attached herein as part of EXHIBIT B, pages 26-28, with the following excerpts incorporated herein:

> "With this latest release, HOLO AI Insights has evolved to now address neurovascular research. Surgalign has partnered with Dr. Brian Jankowitz, a fellowship trained cerebrovascular neurosurgeon, for neurovascular research with HOLO AI Insights."

> "Dr. Jankowitz, MD is a neurosurgery specialist with extensive experience in Neurocritical Care Disorders. He is affiliated with the medical facilities Hospital of the University of Pennsylvania and Cooper University Hospital. He previously served as an associate professor of neurological surgery at the University of Pittsburgh School of Medicine and served as faculty of the UPMC Neurosurgery Department and UPMC Stroke Institute where he specialized in both open and endovascular neurosurgery. Dr. Jankowitz earned a bachelor of science degree from the University of Notre Dame and received his medical degree from Temple University School of Medicine."

According to the press release issued on May 11, 2023, attached herein as part of EXHIBIT B, pages 29-32, with the following excerpts incorporated herein:

> "Two new sites added in May 2023 for HOLO Portal; onboarding underway with cases to be scheduled."

> "Throughout 2023, we have advanced our HOLO AI portfolio with an upgraded HOLO Portal system, and the launch of HOLO AI Insights for research-use for both spine imaging and neurovascular research," stated Terry Rich, President and Chief Executive Officer. "This was made possible by the invaluable feedback from the medical community, and we couldn't be happier to be working with such world-class physicians to harness the full potential of artificial intelligence. We are focused on further enhancements to our AI platform with a goal to expedite commercialization efforts as we capitalize on the Digital Health opportunity."

*Defendant Statement #2:*

*"And -- so we've got a very full funnel now, and so we're looking to get more units placed."*

CEO Terry Rich stated the following one month prior to filing bankruptcy, in regards to the demand for the HOLO portal technology.

> *"And -- so we've got a very full funnel now, and so we're looking to get more units placed."*

When questioned during the Surgalign Holdings, Inc. (SRGA) Q1 2023 Earnings Conference Call May 11, 2023 at 4:30 PM ET, CEO Terry Rich provided the following response, obtained from the Conference Call transcript:

**Swayampakula Ramakanth - H.C. Wainwright question:**

> *Okay. In terms of the HOLO Portal, Terry, you're saying that the sales cycle continues to be long. Can you add some additional commentary around it in terms of like what do you mean by long -- you note a certain number of centers that you will be able to achieve by the end of the year, what is the target now in terms of installation base for end of 2023?*

**Terry Rich response:**

> *Yes, sure. So RK, we didn't provide a target, but -- and part of that is because it's been long. Sales cycle for all capital out there has been very long now regardless of the model they view it all as capital. And so it has been long -- could be. We've had -- we've got a couple of accounts, we're getting hopefully close to coming on now that have been in the funnel for over a year. So it has been a long path on a lot of these. The typical capital sales cycle just broadly in the industry is anywhere from 6 to 18 months. <u>So it's about getting the funnel full and pull them through. And -- so we've got a very full funnel now, and so we're looking to get more units placed.</u>*

## IV. SECTION 510(b) CLAIMS

*Defendant's Claim: The alleged claims are section 510(b) claims which were cancelled, released, and extinguished under the confirmed Plan.*

*Plaintiff's Position: Shareholders did not have voting rights, or equal opportunity, to approve or disapprove the confirmed Plan.*

The confirmed Plan did not grant common shareholders voting rights, therefore removing any possible shareholder objection of said "Plan," as outlined in The Notice Of Non-Voting Status for Holders Of Impaired Claims, attached herein as EXHIBIT C.

The confirmed Plan did not provide equal opportunity for shareholders to issue objection to said Plan, and as a result, shareholders had their unsecured claims cancelled, released, and

extinguished upon approval of said Plan, with absolutely no regard or consideration for the shareholders.

## V. CONFUSION OVER COUNSEL REPRESENTATION

On September 27, 2023, the Bankruptcy Court entered an Order approving the Disclosure Statement and confirming the Plan, thus terminating the debtor's legal representation by White & Case LLP, and Jackson Walker LLP, which allowed Pachulski, Stang, Ziehl, & Jones to take over all legal matters for the debtor, effective September 27, 2023. This information has been confirmed as of October 13, 2023, with White & Case LLP.

On October 2, 2023, 5 days AFTER termination of legal representation, Veronica Polnick from Jackson Walker LLP filed said Motion to Dismiss on behalf of the Defendant. This information has been confirmed as of October 13, 2023, with the Office of The Court Clerk for the Southern District of Texas, Houston Division.

The fact remains that the summons' were properly served by the Plaintiff, to both the Defendant and its legal counsel on September 11, 2023. Jackson Walker LLP was not served a summons since White & Case LLP was the Defendant's legal counsel, as defined on the docket. In an effort to understand how Jackson Walker LLP obtained a copy of said summons and what authority Jackson Walker LLP had to file said motion on behalf of the Defendant 5 days AFTER termination of legal representation, Plaintiff contacted Veronica Polnick on October 13, 2023, previously filed as "EXHIBIT B." As of October 31, 2023, Plaintiff had not received a copy of said notice of motion to dismiss from Counsel, affecting Plaintiff's ability to respond timely and accurately to said motion.

After the SCHEDULING CONFERENCE held on January 10, 2024, Pachulski, Stang, Ziehl, & Jones provided multiple copies of the Motion to Dismiss to the Plaintiff, per the Judge's request.

## VI. SERVICE REGULATION COMPLIANCE

Defendant's Counsel, namely Veronica Polnick of Jackson Walker LLP, failed to manually serve Plaintiff written notice of Motion to Dismiss, filed on October 2, 2023. Plaintiff is Pro Se, who is not registered as a Filing User in accordance with the Federal Rules of Civil and Criminal Procedure, and the Local Rules of this Court.

As a result, Plaintiff was not able to respond to said motion due to not being properly served by Counsel, namely Veronica Polnick of Jackson Walker LLP. Ms. Polnick filed said motion on day 21, and neglected to serve documents according to Federal Rules of Civil and Criminal Procedure.

As previously stated, Pachulski, Stang, Ziehl, & Jones has since provided multiple copies of the Motion to Dismiss to the Plaintiff.

## VII. INTENTIONAL SELECTIVE DISCLOSURE

Ms. Polnick referred to the Exhibits filed in the Plaintiff's Complaint as "a kitchen sink of exhibits," in her Motion to Dismiss. Plaintiff appreciates that Counsel recognizes the thoroughness of the Plaintiff's Exhibits, and understands the abundance of evidence gathered, and how that evidence led to investor's "being left in the dark" in relation to the actors involved, and their long history of deception and fraud, which was initially discovered at the commencement of the SEC accounting fraud investigation in March of 2020, which was never forewarned in a press release until August 3, 2022, after the culmination of said investigation.

Intentional Selective Disclosure, as defined under Regulation FD, requires issuers meet Regulation FD's "public disclosure" requirement by filing a Form 8-K, by distributing a press release through a widely disseminated news or wire service, or by any other non-exclusionary method of disclosure that is reasonably designed to provide broad public access.

The Defendant did in fact comply to the Regulation FD requirement by issuing an 8-K, and corresponding Exhibit 99.1 on March 20, 2020, attached herein as "EXHIBIT D," in which the Defendant SELECTIVELY worded the investigation as an "internal investigation," and NEVER ONCE mentioned the Securities and Exchange Commission ("SEC") being directly involved in initiating this "internal investigation." The Defendant then decided to specifically mention the "SEC" in Exhibit 99.2, attached herein as "EXHIBIT E," namely the "ongoing SEC investigation related to the periods 2014 through 2016." As this was documented as an "Employee Communication, intended for email distribution to all RTI Surgical employees immediately following the Form 12b-25 press release," this was also a deceitful and misleading way to "comply" with the Regulation FD requirements, by selectively choosing to disclose the "SEC" on an internal employee memo, but NOT disclosing the "SEC" on Exhibit 99.1, which was a public disclosure. The Selective Disclosure detailed herein can only be assumed to be intentional, as to not deter future investors by fully disclosing the SEC investigation in the public domain.

## VIII. DOCTRINE OF STARE DECISIS

Plaintiff pleads that the Court consider the foundational doctrine of stare decisis in a prior case, namely, *Lowry v. RTI Surgical Holdings, Inc., 532 F.Supp.3d 652*, Dist. Court, ND Illinois 2021, attached herein as "EXHIBIT F", in which a previous court has ruled on the same, or a closely related issue, which included former management of RTI Surgical Holdings, Inc., namely Jonathon M. Singer, who was also later employed by the Defendant as Chief Financial and Operating Officer, again allowing the continuum of fraud, with no change in behavior.

The court presiding over *Lowry v. RTI Surgical Holdings, Inc., 532 F.Supp.3d 652* denied the Defendant's Motion to Dismiss as follows, and expanded upon at *https://casetext.com/case/lowry-v-rti-surgical-holdings-inc*:

> *"For the foregoing reasons, the Court denies the motions to dismiss submitted collectively by defendants RTI, Farhat, and Singer [dkt. no. 59], defendant Hutchinson's motion to dismiss [dkt. no. 65], defendant Jordheim's motion to dismiss [dkt. no. 62], and*

*defendant Louw's [dkt. no. 61] motion to dismiss. The defendants are directed to answer
the amended complaint by no later than April 29, 2021."*

## IX. CONCLUSION

For all of the reasons set forth extensively herein, Plaintiff respectfully opposes the Defendant's
Motion to Dismiss, and pleads with the Court to allow the case to move forward, that the Court
approve the Recovery of Money pursuant to FRBP 7001(1), and deny the discharge in
bankruptcy of any debtor who has committed any acts of fraud, misrepresentation, deceit, or
false pretenses under §523(a)(2), for such other and further relief the Court deems appropriate.

RESPECTFULLY SUBMITTED,

Ryan Messner, Plaintiff, pro se
ryanmessner@hotmail.com
570 Camphor Way
Lexington, KY 40509
859.559.7985

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of PLAINTIFF RESPONSE TO DEFENDANT'S MOTION TO DISMISS has been served as follows:

**Notice by USPS Ground Advantage was sent to the following persons/entities on February 5, 2024:**

Jeffrey P. Nolan
Pachulski Stang Ziehl & Jones
10100 Santa Monica Blvd # 13
Los Angeles CA 90067-4003

Colin R. Robinson
Pachulski Stang Ziehl & Jones
919 N Market St # 17
Wilmington DE 19801-3023

TOTAL: 2

## BYPASSED RECIPIENTS

**The following addresses were not sent this notice due to an undeliverable address, and previously filed out of date forwarding orders with USPS.**

Surgalign Holdings, Inc., 520 Lake Cook Road, Suite 315, Deerfield, IL 60015-4926

## NOTICE CERTIFICATION

I, Ryan Messner, declare under the penalty of perjury that I have sent the attached document to the above listed persons/entities in the manner shown, and prepared the Certificate of Service and that it is true and correct to the best of my information and belief,

Ryan Messner