# Exhibit A

 SEARCH                     MENU



# Terry Rich

# PRESIDENT AND CHIEF EXECUTIVE OFFICER

Terry Rich is President and Chief Executive Officer for the Company. Terry has a proven track record of leading global businesses, driving sales execution and building commercial organizations to drive growth. Prior to joining the Company, he led the turnaround of Alphatec Spine from December 2016 through December 2018. As a director and CEO, he strengthened the organization's competencies, redirected the portfolio with 12 new products and laid the foundation for focused innovation and growth. Prior to Alphatec Spine, Terry was President of Upper Extremities at Wright Medical Group, N.V. Terry has held sales leadership positions at Tornier, NuVasive and DePuy Spine earlier in his career.



Terms of Use

Web Privacy Policy and Transparency Disclosure Notice

© 2023 Surgalign Spine Technologies, Inc. All rights reserved.



 **SEARCH**



 **MENU**



# David Lyle

3

# CHIEF FINANCIAL OFFICER

David Lyle joined the company in March 2022 as Chief Financial officer with fourteen years of public company CFO experience and more than 25 years of experience in technology markets. David has an established track record in successfully scaling high growth technology companies, having served in leadership roles in both public and private organizations. Prior to joining Surgalign, he was the CFO of Airgain, a publicly traded wireless communications systems company. Prior to joining Airgain, David was the CFO of Sunniva, Inc., and before Sunniva, he was CFO at Maxwell Technologies, Inc. for four years, which was acquired by Tesla in 2019. He also served as the CFO of Entropic Communications, Inc., which was acquired in 2015 by MaxLinear. Prior to Entropic, David served as the CFO of RF Magic, acquired by Entropic in 2007, Zyray Wireless, acquired by Broadcom in 2004, and Mobilian, acquired by Intel in 2003. He also has prior work experience in the commercial banking industry.

David holds a Bachelor of Science in Business Administration from University of Southern California, a Master of International Management from the Thunderbird School of Global Management, and a Master of Business Administration from Arizona State University.



Terms of Use
Web Privacy Policy and Transparency Disclosure Notice

© 2023 Surgalign Spine Technologies, Inc. All rights reserved.

4

Marc Mackey - Surgalign

  

SEARCH MENU



# Marc Mackey



# EXECUTIVE VICE PRESIDENT, DIGITAL SURGERY

Marc Mackey is Executive Vice President of Digital Surgery for the Company. He leads the company's efforts to deliver on the promise of digital surgery. Marc has more than 25 years of orthopedic and surgical-enabling technology experience across the spectrum of business functions, including product development and strategic marketing, business development, corporate strategy, technology innovation, and post-acquisition portfolio integration. He spent more than 20 years at Brainlab, leading the orthopedic division prior to its acquisition by Smith+Nephew in 2019. When that acquisition closed, Marc led the integration and assumed leadership of the digital surgery and robotics division. He began his career as a life sciences research engineer in the space shuttle program and started his medical device career in sales of neurosurgical robotics. Marc holds a Bachelor's degree in Aeronautical and Astronautical Engineering from Purdue University and a Master's in Bioengineering from the University of California, San Diego.



Terms of Use
Web Privacy Policy and Transparency Disclosure Notice

© 2023 Surgalign Spine Technologies, Inc. All rights reserved.



Suzanne Zoumaras - Surgalign

  

SEARCH

MENU



# Suzanne Zoumaras

7

# CHIEF PEOPLE OFFICER

Suzanne Zoumaras is Chief People Officer for the Company. She has more than 20 years of experience leading people and driving organizational value by aligning business strategy, culture, and people practices. Most recently, Suzanne served as Principal and Co-founder of Human Capital Resource Partners, providing deep domain and management expertise to companies experiencing high growth or significant change. Prior to that, she was Executive Vice President & Chief People and Places Officer for Arena Pharmaceuticals. Previously, she held executive leadership roles with multiple public and private companies, including Teradata, Atmel, Entropic Communications, and Biosite (now part of Abbvie). Suzanne began her career working for a private investment banking/venture capital firm. She received her Bachelor of Science in Business Administration (emphasis Finance) from San Diego State University and her Certificate in Human Resources Management from the University of California, San Diego.



Terms of Use

Web Privacy Policy and Transparency Disclosure Notice

© 2023 Surgalign Spine Technologies, Inc. All rights reserved.

Bryan Cornwall - Surgalign

  

SEARCH MENU



# Bryan Cornwall

*9*

Bryan Cornwall - Surgalign

# EXECUTIVE VICE PRESIDENT, RESEARCH AND CLINICAL AFFAIRS

G. Bryan Cornwall, PhD, MBA, PEng joined the Company in June 2020 as Executive Vice President, Research and Clinical Affairs. Bryan brings his 25 years of clinical operations and research experience in the medical device industry from the University of San Diego's Shiley-Marcos School of Engineering, where he was an Associate Professor of Mechanical Engineering. His experience driving innovation through scientific competence within the spine industry, combined with his strong surgeon relationships, will aid the continued development of Surgalign's global spine portfolio with a focus on clinical differentiation. He is well-published with more than 24 peer-reviewed publications, 24 U.S. patents and eight book chapters. Bryan previously held leadership roles in his 12-plus-year tenure at NuVasive, including President SOLAS & NSF, Senior Vice President of Clinical Operations & Research, Senior Vice President of Research & Clinical Resources, and Vice President of R&D, as well as leadership roles at MacroPore Biosurgery and DePuy-ACE.



Terms of Use
Web Privacy Policy and Transparency Disclosure Notice

© 2023 Surgalign Spine Technologies, Inc. All rights reserved.

*10*

7/18/23, 3:18 PM

Paolo Amoruso - Surgalign

 SEARCH



 MENU



# Paolo Amoruso

//

Paolo Amoruso - Surgalign

# CHIEF LEGAL OFFICER AND CORPORATE SECRETARY

Paolo Amoruso is Chief Legal Officer and Corporate Secretary for the Company. He has 25 years of experience serving public companies in various legal, financial, and executive roles. Paolo began his career with Shell Oil Company as a Tax Attorney, served as Assistant General Counsel to the International Division of Devon Energy Corporation, and as Vice President of Legal and Commercial Affairs and Corporate Secretary of Hyperdynamics Corporation. In 2016, he joined McGowen & Fowler PLLC, a boutique energy law firm specializing in corporate transactional matters, litigation and mergers and acquisitions for small- to medium-sized public companies. While with McGowen & Fowler, he was brought in by the Board of Attis Oil and Gas (a UK-AIM listed company) to serve as General Counsel and Executive Chairman of the Board, where he led the restructuring and the subsequent reverse merger with Helium One Global Ltd.

Paolo holds a Juris Doctorate, Master of Business Administration, and Bachelor of Science in Economics from the University of Houston and a Master in Tax Law from the NYU School of Law



Terms of Use
Web Privacy Policy and Transparency Disclosure Notice

© 2023 Surgalign Spine Technologies, Inc. All rights reserved.

*12*

 **SEARCH**   **MENU**



# Enrico Sangiorgio

*13*

# EXECUTIVE VICE PRESIDENT, INTERNATIONAL

Enrico Sangiorgio was named Vice President and General Manager, International in June 2017. Enrico brings 20-plus years of diverse commercial and leadership experience building effective teams and driving international expansion. His expertise includes experience in sales, marketing, business development, general management, and mergers and acquisitions in multiple geographies covering medical devices, pharma, biotech, consumer health and digital health solutions.

Prior to joining the Company, Enrico led new business development for women's health and urology in the Europe, Middle East and Africa (EMEA) region at BARD Medical, in continuation of his work as head of distributor markets EMEA at American Medical Systems (AMS)/Boston Scientific. Prior to AMS, he was Vice President of Business Development at Evofem BioSciences covering international markets. Earlier in his carrier, he was Vice President of Global Sales and Marketing at WCG, European brand leader at Astellas Pharma and marketing lead at Merck and Co.

Enrico earned a Master of Science in development economics from the SOAS University of London and a Bachelor of Science in business administration from the LUISS Business School in Rome.



Terms of Use
Web Privacy Policy and Transparency Disclosure Notice

© 2023 Surgalign Spine Technologies, Inc. All rights reserved.

14

# Exhibit B



NEWSROOM    SERVICES ⌄    CONTACT US    FRANÇAIS    SIGN IN    **REGISTER**

# Surgalign™ Announces the First Successful Surgical Procedure Utilizing its HOLO Portal™ Surgical Guidance System

Indiana Spine Hospital is the first to utilize the HOLO Portal system, the world's first artificial intelligence (AI) and augmented reality (AR) guidance system

May 05, 2022 09:00 ET    | Source: Surgalign Holdings, Inc.    **Follow**

**Company Profile**

Surgalign Holdings, Inc.

Website:
https://www.surgalig

**Press Release Actions**

Print
Download PDF
Subscribe via RSS
Subscribe via ATOM
Javascript

Share
f
in
reddit
✉
⊞

DEERFIELD, Ill., May 05, 2022 (GLOBE NEWSWIRE) -- Surgalign Holdings, Inc., (NASDAQ: SRGA) a global medical technology company focused on elevating the standard of care by driving the evolution of digital health, today announced that the Company's HOLO Portal surgical guidance system has officially entered clinical use. The first procedure was performed at Indiana Spine Hospital in Carmel, Indiana by Dr. Mario Brkaric, a board-certified orthopedic surgeon.

The HOLO Portal system is the world's first surgical guidance system incorporating AI and AR and the first clinical application of Surgalign's HOLO™ AI digital health platform. HOLO Portal's convolutional neural networks process intraoperative images to autonomously identify patient anatomy and plan patient-specific pedicle screw trajectories approved by the surgeon. The system then displays the anatomy and pinpoints the trajectories for ease of placement, using the AR display.

commencement of clinical use. The Company has now moved into its limited market release and intends to ramp up its site locations. As cases are performed and data is accumulated, the Company also intends to integrate new applications on its platform to advance the quality of care and improve patient outcomes.

"HOLO Portal is a remarkably efficient technology in that its AI autonomously labels anatomy and proposes a surgical plan from intraoperative imaging. I then view the resulting guidance information in 3D through its holographic display. This helps ensure that every pedicle screw is precise in its size, trajectory, and placement," said Dr. Brkaric. "That improvement in surgical precision can help lead to better patient outcomes and fewer complications. This is groundbreaking technology, and I expect that many more surgeons will adopt the HOLO Portal in our practice and across the country."

"Congratulations to Dr. Brkaric for completing the first surgical case with the Surgalign HOLO Portal system," said Dr. Rick Sasso, founding member and President of Indiana Spine Group. "It's great to see the physicians at Indiana Spine Group adopting new technologies and I look forward to adopting the HOLO AI technology into my practice to drive better patient outcomes."

"It's an absolute honor to work with Indiana Spine Hospital and Dr. Brkaric on the first clinical adoption of our HOLO™ AI technology," said Terry Rich, President and CEO of Surgalign. "This is truly a foundational step in our new digital phase as we launch the first of many planned AI technologies in our roadmap."

**About Surgalign Holdings, Inc.**

Surgalign Holdings, Inc. is a global medical technology company committed to the promise of digital health to drive transformation across the surgical landscape. Uniquely aligned and resourced to advance the standard of care, the company is building technologies physicians and other health providers will look to for what is truly possible for their patients. Surgalign is





NEWSROOM    SERVICES ⌄    CONTACT US    FRANÇAIS    SIGN IN    REGISTER

🔍

**Company Profile**

Surgalign Holdings, Inc.

Website:
https://www.surgalig

**Press Release Actions**

Print

Download PDF

Subscribe via RSS

Subscribe via ATOM

Javascript

# Surgalign Holdings, Inc. Announces First Quarter 2022 Results and Raises Full Year 2022 Revenue Guidance Range

May 10, 2022 16:01 ET| Source: Surgalign Holdings, Inc.    Follow

Share

f

in

reddit

✉

⊞

DEERFIELD, Ill., May 10, 2022 (GLOBE NEWSWIRE) -- Surgalign Holdings, Inc., (NASDAQ: SRGA) a global medical technology company focused on elevating the standard of care by driving the evolution of digital surgery, today announced financial results for its 2022 first quarter ended March 31, 2022.

**Financial Highlights and Key Events:**

- Received FDA 510(k) clearance for HOLO Portal™ System, the world's first AI-driven AR guidance system for spine surgery;

- 1st Holo Portal™ site up and running;

- 1st successful Holo Portal™ case completed;

- Total global spine revenue of $20.6 million;

- Adjusted EBITDA loss of $13.3 million;

- Cash and cash equivalents of $44.7 million; generated approximately $17.7 million in gross proceeds from underwritten public offering.

"I'm pleased to report that during the first quarter, we began to see market conditions improve with fewer COVID-related restrictions in place, and higher demand for our products as a result. With the improved environment, we now expect higher revenue for 2022 than our prior forecast with opportunities to further grow product revenue as we continue to innovate and expand," stated Terry Rich, President and Chief Executive Officer of Surgalign Holdings.

*3*

NEWSROOM    SERVICES ⌄    CONTACT US    FRANÇAIS    SIGN IN    REGISTER

commercial stage to bring this new revolutionary technology to market. This past week, we reached another major milestone with our first site up and first successful cases completed using our HOLO Portal. We expect more sites to be launched this quarter and our goal remains to have between 10-15 sites up and running by the end of the year with a more widespread launch in 2023. While our initial focus is the spine, we believe our artificial intelligence, or AI, platform will apply to other medical specialties and types of surgical procedures, opening up a much larger global market opportunity. It is our belief that AI can be applied across a variety of anatomy to drive improvements in healthcare, with the end goal to improve patient outcomes."

**First Quarter Comparisons**

Total revenue for the first quarter ended March 31, 2022, was $20.6 million as compared to $23.3 million in the first quarter ended March 31, 2021. The decrease in revenue was primarily related to the ongoing impact of COVID-19, which continued to impact surgical procedures performed.

The Company reported gross margins of 68.9% and 73.2% for the three months ended March 31, 2022 and 2021 respectively, with the decline related to lower revenue for the comparable periods, as well as product rationalization initiatives.

On a non-GAAP basis, the Company reported gross margin of 70.9% as compared to gross margin of 75.5% in the first quarter of 2021.

Total operating expenses for the first quarter of 2022 were $23.1 million as compared to $31.5 million in the comparable year-ago period, a decline of $8.4 million or 26.6%. The year-over-year improvement in operating expenses was primarily driven by a $8.5 million decrease in the Holo milestone valuation and a $0.8 million decline in general and administrative expenses. This was offset by a $1.6 million increase in research and development expenses, primarily related to the continued development of the HOLO™ platform and obtaining regulatory approval.



NEWSROOM    SERVICES⌄    CONTACT US    FRANÇAIS    SIGN IN    REGISTER

operating expense was approximately $0.9 million in asset impairment charges related to the impairment of instruments during the quarter, $0.9 million in transaction and integration expenses related to issuance costs associated to the newly issued warrants, non-cash stock-based compensation of $1.4 million and a gain of $8.5 million due to adjustments to the fair value of the Holo milestones.

The Company reported an operating loss of $8.9 million in the first quarter of 2022 as compared to an operating loss of $14.4 million in the first quarter of 2021. Net income from continuing operations for the first quarter of 2022 was $0.0 million as compared to a net loss from continuing operations of $15.2 million for the first quarter of 2021.

Adjusted earnings before interest, taxes, depreciation and amortization (Adjusted EBITDA), for the first quarter of 2022 was a loss of $13.3 million as compared to an Adjusted EBITDA loss of $9.8 million for the first quarter of 2021.

As of March 31, 2022, cash and cash equivalents were approximately $44.7 million. This compares to $51.3 million reported as of December 31, 2021. During the first quarter of 2022, the Company completed an underwritten public offering of its common stock, raising gross proceeds of approximately $17.7 million.

**Fiscal 2022 Business Outlook**

The Company now expects full year revenue in the range of $86 to $90 million, which represents a $3.0 increase from its previously issued guidance of $83 to $87 million. The increased guidance is based on improving market conditions and a stronger outlook for the Company's products and solutions.

**FDA 510(k) Clearance of HOLO Portal System**

On January 18, 2022, the Company announced that it had received clearance of its HOLO Portal surgical guidance system for use within lumbar spine procedures. The HOLO Portal system is the world's first artificial intelligence (AI)-driven



The HOLO Portal system combines machine learning-based image guidance technology with AR, automated spine segmentation (i.e., anatomy recognition), and automated surgical planning utilizing proprietary AI software. Intraoperative images are autonomously processed by the AI system to create a patient-specific plan that is presented to the surgeon using the AR display.

**First HOLO Portal Cases**

On May 5, 2022, the Company announced that its HOLO Portal surgical guidance system had officially entered clinical use, with the first surgical procedure completed. The surgery was performed at Indiana Spine Hospital in Carmel, Indiana by Dr. Mario Brkaric, a board-certified orthopedic surgeon.

**Conference Call**

Surgalign will host a conference call and audio webcast at 4:30 p.m. ET today. The conference call can be accessed by dialing (866) 604-1616 (U.S.) or (201) 689-8043 (International). The webcast can be accessed through the investor section of Surgalign's website at surgalign.com/investors/. A replay of the conference call will be available on Surgalign's website for one month following the call.

**About Surgalign Holdings, Inc.**

Surgalign Holdings, Inc. is a global medical technology company committed to the promise of digital health and is building out its digital surgery platform to drive transformation across the surgical landscape. Uniquely aligned and resourced to advance the standard of care, the company is building technologies surgeons will look to for what is truly possible for their patients. Surgalign is focused on bringing surgeons solutions that predictably deliver superior clinical and economic outcomes. Surgalign markets products throughout the United States and in more than 50 countries worldwide through an expanding network of top independent distributors. Surgalign is headquartered in Deerfield, IL, with commercial, innovation and





HOME    MAIL    NEWS    FINANCE    SPORTS    ENTERTAINMENT    LIFE    SEARCH    SHOPPING    YAHOO PLUS    MORE...

yahoo!finance

Search for news, symbols or companies                    Sign in            Mail

Finance    Watchlists    My Portfolio    Markets    News    Videos    🅥 Yahoo Finance Plus    Screeners    Yahoo Finan    Try the new yahoo/finance →

(i) U.S. markets close in 2 hours 32 minutes

| S&P 500 | Dow 30 | Nasdaq | Russell 2000 | Crude Oil | Gold |
|---|---|---|---|---|---|
| 4,503.98 | 34,952.73 | 14,099.65 | 1,804.81 | 77.25 | 1,964.60 |
| +8.28 (+0.18%) | +135.03 (+0.39%) | +5.27 (+0.04%) | +6.48 (+0.36%) | -1.01 (-1.29%) | -1.90 (-0.10%) |

GLOBE NEWSWIRE

# Surgalign™ Announces Clinical Site Expansion in the Commercialization of its HOLO Portal™ Surgical Guidance System in Ohio

**Surgalign Holdings, Inc.**
July 6, 2022 · 4 min read

Surgalign Holdings, Inc.

*This marks the second medical facility to clinically use HOLO Portal, the world's first artificial intelligence (AI)-driven, augmented reality (AR) guidance system for spine surgery*

DEERFIELD, Ill., July 06, 2022 (GLOBE NEWSWIRE) -- Surgalign Holdings, Inc., (NASDAQ: SRGA) a global medical technology company focused on elevating the standard of care by driving the evolution of digital health, today announced continued momentum in the commercialization of its HOLO Portal surgical guidance system. The Company is pleased to report that Selvon St. Clair, MD, PhD, and a board certified orthopaedic and spinal surgeon at the Orthopaedic Institute of Ohio, performed his first case with the HOLO Portal system.

HOLO Portal is the world's first surgical guidance system to incorporate AI and AR. This is the first clinical application of Surgalign's HOLO™ AI digital health platform. The system's AI processes intraoperative images to autonomously segment and label the anatomy and plan patient-specific pedicle screw trajectories that are approved by the surgeon. The HOLO Portal system uses AR to overlay the segmented AI reconstruction over

Quote Lookup

**TRENDING**

1. Xi Jinping faces a more skeptical US business community as he makes his case for investment

yahoo!finance



Sign in          Mail

Finance    Watchlists    My Portfolio    Markets    News    Videos    YF Yahoo Finance Plus    Screeners    Yahoo Finan [Try the new yahoo/finance →]

month high, boosted by rate cuts bets

China-linked ETFs draw bullish options
bets ahead of Biden-Xi meet

images on a monitor across the room increasing the cognitive load on the
surgeon in the case. With the HOLO Portal system, the AI anatomic
segmentation displayed through AR provides a 3D visualization within the
surgical field. My first case was seamless—easy to setup, and the crisp
holographic image facilitated precise screw positioning increasing my
confidence in the system," said Dr. St. Clair, who completed his orthopedic
surgery residency at Cleveland Clinic and his spine fellowship at Emory
University School of Medicine Spine Center, GA.

Dr. Frank Fumich, also of the Orthopaedic Institute of Ohio, added, "The
system continues to impress me as well, but more importantly, the
technology will help patients by displaying key guidance information
within the surgical field with minimal distractions. We look forward to
utilizing the HOLO Portal surgical guidance system as we continuously
look for new and innovative ways to improve patient outcomes."

In January 2022, the Company received U.S. Food & Drug Administration
(FDA) 510(k) clearance for use of the HOLO Portal system within lumbar
spine procedures. The Company is currently expanding the system's
limited market release and intends to ramp up its site locations
throughout the year. As cases are performed and data is accumulated, the
Company also intends to integrate new applications on its platform to
advance the quality of care and improve outcomes for patients.

"Congratulations to Dr. St. Clair for completing the first surgical case in
Ohio with the Surgalign HOLO Portal system," said Terry Rich, President
and CEO of Surgalign. "We couldn't be more pleased with the performance
of our HOLO Portal system to date, and the surgeon excitement
generated by the technology is palpable. We believe to be on the cusp of
something special here at Surgalign and look forward to bringing the
benefit of HOLO Portal technology to thousands more patients to come."

**About Surgalign Holdings, Inc.**

Surgalign Holdings, Inc. is a global medical technology company
committed to the promise of digital health to drive transformation across
the surgical landscape. Uniquely aligned and resourced to advance the
standard of care, the Company is building technologies physicians and
other health providers will look to for what is truly possible for their
patients. Surgalign is focused on developing solutions that predictably
deliver superior clinical and economic outcomes. Surgalign markets
products throughout the United States and in more than 50 countries
worldwide through an expanding network of top independent distributors.
Surgalign is headquartered in Deerfield, IL, with commercial, innovation
and design centers in San Diego, CA, Warsaw and Poznan, Poland, and

HOME    MAIL    NEWS    FINANCE    SPORTS    ENTERTAINMENT    LIFE    SEARCH    SHOPPING    YAHOO PLUS    MORE...

yahoo/finance    [ Search for news, symbols or companies ]    ( Sign In )    Mail

(●) U.S. markets close in 2 hours 31 minutes

| S&P 500 | Dow 30 | Nasdaq | Russell 2000 | Crude Oil | Gold |
|---|---|---|---|---|---|
| 4,504.63 | 34,965.34 | 14,105.39 | 1,803.45 | 77.23 | 1,965.10 |
| +8.93 (+0.20%) | +137.64 (+0.40%) | +11.01 (+0.08%) | +5.13 (+0.29%) | -1.03 (-1.316%) | -1.40 (-0.072%) |

# Surgalign Holdings, Inc. Announces Second Quarter 2022 Results and Reiterates Full Year 2022 Revenue Guidance Range

**Surgalign Holdings, Inc.**
August 9, 2022 · 24 min read

Surgalign Holdings, Inc.

DEERFIELD, Ill., Aug. 09, 2022 (GLOBE NEWSWIRE) — Surgalign Holdings, Inc., (NASDAQ: SRGA) a global medical technology company focused on elevating the standard of care by driving the evolution of digital surgery, today announced financial results for its 2022 second quarter ended June 30, 2022.

**2022 Second Quarter Key Highlights and Subsequent Events:**

- First successful surgical procedures utilizing the HOLO Portal™ Surgical Guidance System in Indiana and further expansion in Ohio with more sites in the pipeline.

- Launch of the Surgalign® Patient Access Program: formed strategic partnership with PRIA Healthcare to support Program and improve patient healthcare coverage.

- Relaunch of the CervAlign® Anterior Cervical Plate system.

- Launch of Fortilink®-A Interbody with TiPlus™ technology expanding addressable market.

Quote Lookup

**TRENDING**

1. Biden and Xi are set to meet on the sidelines of the APEC conference. Follow live updates

*9*

HOME    MAIL    NEWS    FINANCE    SPORTS    ENTERTAINMENT    LIFE    SEARCH    SHOPPING    YAHOO PLUS    MORE...

yahoo/finance                                                      Sign In                    Mail

4.  Could employer subsidies aid the childcare crisis?

5.  Israel Latest: UN Slams Hospital Raid, US Demands 'Special Care'



President and Chief Executive Officer of Surgalign Holdings. "We expanded the reach of our HOLO Portal Surgical Guidance System, with successful cases performed in Indiana and Ohio, and we are close to securing additional sites throughout the United States. Our plan remains to have between 10-15 sites up and running by year-end and we are in discussions with approximately 20 additional potential sites."

Mr. Rich continued, "Our focus near-term is on the commercialization of the HOLO Portal system, integrating procedural technologies, and expanding our HOLO™ AI Platform capabilities. Concurrently, we will continue to build out our engineering capabilities, bring new products to market, and leverage our distribution to expand spine product sales globally. The new products we have launched are gaining traction and there is a lot of excitement building at Surgalign. We believe we are well positioned for growth in the second half of the year, particularly in the fourth quarter, with significantly greater prospects in the future."

**Second Quarter Comparisons**

Total revenue for the three months ended June 30, 2022, was $20.6 million as compared to $24.8 million in the comparable year-ago period. The decrease in revenue was primarily related to hospital and surgical center staffing shortage, delays in procedures caused by the pandemic, and supply chain constraints.

The Company reported gross margins of 68.9% and 70.9% for the three months ended June 30, 2022 and 2021 respectively, with the decline related to an increase in inventory write-offs related to continued product rationalization.

On a non-GAAP basis, the Company reported gross margin of 73.5% for the three months ended June 30, 2022, as compared to gross margin of 73.1% in the comparable year-ago period.

Total operating expenses for the three months ended June 30, 2022 were $27.6 million as compared to $30.9 million in the comparable year-ago period, a decrease of $3.3 million or 10.6%. The primary driver was a $1.3 million decrease in "General and administrative" expenses caused by a reduction in spending through continued simplification of the distribution and administrative infrastructure. Additionally, there was a decrease in "Asset impairment and abandonment" of $1.2 million due to impairment of the ERP system in 2021 and a reduction in capital expenditures during 2022. This was partially offset by a $0.9 million increase in "Research and development" expenses related to the continued development of the HOLO AI platform and obtaining regulatory approval.



HOME    MAIL    NEWS    FINANCE    SPORTS    ENTERTAINMENT    LIFE    SEARCH    SHOPPING    YAHOO PLUS    MORE...

yahoo/finance                                          Sign in        Mail

expense was approximately $1.0 million in asset impairment charges
related to the impairment of instruments during the quarter, $0.2 million
in transaction and integration expenses related to issuance costs
associated to the newly issued warrants, non-cash stock-based
compensation of $0.9 million and a gain of $2.0 million due to
adjustments to the fair value of the Holo Surgical Inc. contract milestones.

The Company reported an operating loss of $13.4 million for the three
months ended June 30, 2022 as compared to an operating loss of $13.3
million in the comparable year-ago period. Net loss from continuing
operations for the three months ended June 30, 2022 was $5.7 million as
compared to a net loss from continuing operations of $10.6 million in the
comparable year-ago period.

Adjusted earnings before interest, taxes, depreciation and amortization
(Adjusted EBITDA), for the three months ended June 30, 2022 was a loss
of $11.7 million as compared to an Adjusted EBITDA loss of $8.5 million in
the comparable year-ago period.

As of June 30, 2022, cash and cash equivalents were approximately $29.3
million. This compares to $51.3 million reported as of December 31, 2021.

**Six Month Year-to-Date Comparisons**

Total revenue for the six months ended June 30, 2022, was $41.2 million as
compared to $48.1 million in the comparable year-ago period. The
decrease in revenue was primarily related to the impact of the global
pandemic, which has led to fewer surgical procedures and hospital staffing
shortages throughout the U.S., among other factors.

The Company reported gross margins of 68.9% and 72.0% for the six
months ended June 30, 2022 and 2021 respectively, with the decline
related to an increase in inventory write-offs related to continued product
rationalization.

On a non-GAAP basis, the Company reported gross margin of 72.2% for
the six months ended June 30, 2022 as compared to gross margin of
74.3% in the comparable year-ago period.

Total operating expenses for the six months ended June 30, 2022 were
$50.7 million as compared to $62.4 million in the comparable year-ago
period, a decrease of $11.7 million or 18.7%. The primary driver was the
decrease in the Holo contract milestone valuation of approximately
$8.1 million, which is recorded through the "Gain on acquisition
contingency" line item on the condensed consolidated statements of
comprehensive loss. This was further reduced by a $2.1 million decrease in
"General and administrative" expenses caused by a reduction in spending
through the continued simplification of the distribution and

**yahoo/finance**

Sign In

Mail



expenditures. This was partially offset by an increase of $2.3 million in "Research and development" expenses related to the continued development of the HOLO AI platform and obtaining regulatory approval.

On a non-GAAP basis, total operating expenses for the six months ended June 30, 2022 were $55.8 million as compared to $55.3 million in the comparable year-ago period. Excluded from Q2 non-GAAP operating expense was approximately $1.9 million in asset impairment charges related to the impairment of instruments during the quarter, $1.1 million in transaction and integration expenses related to financings, non-cash stock-based compensation of $2.3 million and a gain of $10.5 million due to adjustments to the fair value of the Holo Surgical Inc. contract milestones.

The Company reported an operating loss of $22.3 million in the six months ended June 30, 2022 as compared to an operating loss of $27.7 million in the comparable year-ago period. Net loss continuing operations for the six months ended June 30, 2022 was $5.7 million as compared to a net loss from continuing operations of $25.8 million for the comparable year-ago period.

Adjusted earnings before interest, taxes, depreciation and amortization for the six months ended June 30, 2022 was a loss of $25.0 million as compared to an Adjusted EBITDA loss of $18.3 million for the comparable year-ago period.

**Fiscal 2022 Business Outlook**

The Company has reconfirmed its full year revenue outlook to be in the range of $86 to $90 million.

**Conference Call**

Surgalign will host a conference call and audio webcast at 4:30 p.m. ET today. The conference call can be accessed by dialing (888) 645-4404 (U.S.) or (404) 267-0371 (International). The webcast can be accessed through the investor section of Surgalign's website at surgalign.com/investors/. A replay of the conference call will be available on Surgalign's website for one month following the call.

**About Surgalign Holdings, Inc.**

Surgalign Holdings, Inc. is a global medical technology company committed to the promise of digital health and is building out its digital surgery platform to drive transformation across the surgical landscape. Uniquely aligned and resourced to advance the standard of care, the company is building technologies surgeons will look to for what is truly possible for their patients. Surgalign is focused on bringing surgeons

 Surgalign to Exhibit at the Society for Minimally Invasiv... ≡



# Surgalign to Exhibit at the Society for Minimally Invasive Spine Surgery ("SMISS") Annual Forum and the North American Spine Society ("NASS") 2022 Annual Meeting

Company to showcase its HOLO Portal™ surgical guidance system for the first time at an industry event, with live, hands-on demonstrations from surgeons and medical professionals

September 08, 2022   | Source: Surgalign Holdings,   **Follow**
14:00 ET                 Inc.

**Company Profile**

Surgalign Holdings, Inc.

Website:
https://www.surgalig

**Press Release Actions**

Print
Download PDF
Subscribe via RSS
Subscribe via ATOM
Javascript

**Share**

f
in
ⓡ
✉
⊞

DEERFIELD, Ill., Sept. 08, 2022 (GLOBE NEWSWIRE) -- Surgalign Holdings, Inc., (NASDAQ: SRGA) a global medical technology company focused on elevating the standard of care by driving the evolution of digital health, today announced two upcoming industry events it will be participating in and showcasing many of its latest spine and technology innovations.

The **Society for Minimally Invasive Spine Surgery ("SMISS")** will be hosting its Annual Forum on September 29 – October 1, 2022, at the Bellagio in Las Vegas, NV. This three-day event brings together the international community of spine surgeons, orthopaedic surgeons, and neurosurgeons in an open forum focused entirely on minimally invasive spine surgery. Surgalign will be exhibiting *(Booth #301)* many of its latest product innovations, including its Coflex® Interlaminar Stabilization Device, CoFix™ Posterior MIS Fusion System, and CervAlign® Anterior Cervical Plate System, along with its biomaterials

*13*

 **Surgalign to Exhibit at the Society for Minimally Invasiv...** ☰

29ᵗʰ and for the first time at any industry event, will be featuring its HOLO Portal™ Surgical Guidance System with live, hands-on demonstrations.

The **North American Spine Society ("NASS")** will be hosting its 37ᵗʰ Annual Meeting on October 12-15, 2022, at McCormick Place-West Building in Chicago, IL. Founded in 1985, NASS is a global multidisciplinary medical organization for health care professionals who specialize in spinal care and are dedicated to fostering the highest quality, ethical, value-based and evidence-based spinal care through education, research and advocacy. This four-day event will include educational courses, symposiums, webinars and various education programs to foster better patient outcomes in spinal care and will feature hands-on demonstrations from leading spine surgeons around the globe. Surgalign will have on display *(Booth #4841)* its Coflex Interlaminar Stabilization Device, CoFix Posterior MIS Fusion System, CervAlign Anterior Cervical Plate System, and many of its biomaterials products and TETRAfuse 3D technology. The Company will also be showcasing its HOLO Portal Surgical Guidance System in its booth.

"We've made great strides over the past year developing and bringing to market, new and differentiated products for our customers that are designed to improve patient outcomes, and we look forward to showcasing many of our innovations at SMISS and NASS in the coming weeks," stated Terry Rich, President and CEO of Surgalign. "We're especially excited to debut the HOLO Portal system at industry events as we move forward in our commercialization initiatives and expand our reach."

**About Surgalign Holdings, Inc.**
Surgalign Holdings, Inc. is a global medical technology company committed to the promise of digital health to drive transformation across the surgical landscape. Uniquely aligned and resourced to advance the standard of care, the company is building technologies physicians and other health providers will look to for what is truly possible for their patients. Surgalign is focused on developing solutions that predictably deliver

HOME   MAIL   NEWS   FINANCE   SPORTS   ENTERTAINMENT   LIFE   SEARCH   SHOPPING   YAHOO PLUS   MORE...

**yahoo!finance**    Search for news, symbols or companies        Sign in     Mail

(i) U.S. markets close in 2 hours 28 minutes

| S&P 500 | Dow 30 | Nasdaq | Russell 2000 | Crude Oil | Gold |
|---------|--------|--------|--------------|-----------|------|
| 4,505.10 | 34,971.03 | 14,107.73 | 1,803.02 | 77.16 | 1,964.80 |
| +9.40 (+0.21%) | +143.53 (+0.41%) | +13.34 (+0.09%) | +4.70 (+0.26%) | -1.10 (-1.41%) | -1.70 (-0.09%) |

# Surgalign Announces Third Clinical Site in the Commercialization of its HOLO Portal™ Surgical Guidance System

**Surgalign Holdings, Inc.**
September 15, 2022 · 4 min read



Surgalign Holdings, Inc.

*Dr. Jaideep Chunduri of Beacon Orthopedics & Sports Medicine in Cincinnati, OH utilizes HOLO Portal, the world's first artificial intelligence (AI)-driven, augmented reality (AR) guidance system for spine surgery*

DEERFIELD, Ill., Sept. 15, 2022 (GLOBE NEWSWIRE) -- Surgalign Holdings, Inc., (NASDAQ: SRGA) a global medical technology company focused on elevating the standard of care by driving the evolution of digital health, today announced further advancement in the commercialization of its HOLO Portal™ surgical guidance system. The Company is pleased to report that Jaideep Chunduri, MD, a board certified orthopaedic and spinal surgeon at Beacon Orthopedics & Sports Medicine in Cincinnati, Ohio, performed his first case with the HOLO Portal surgical guidance system.

HOLO Portal, the world's first surgical guidance system to incorporate AI and AR, represents the initial clinical application of Surgalign's HOLO™ AI digital health platform. The system's AI processes intraoperative images to autonomously segment and label the anatomy and plan patient-specific pedicle screw trajectories that are approved by the surgeon. The HOLO



Quote Lookup

**TRENDING**

1. Stock market news today: Stocks mixed as market rally stalls

2. Pakistan and IMF reach preliminary deal for releasing $700 million from $3B

*15*





Sign In                    Mail

visualize trajectories and guide surgical instruments.

4. Biden and Xi are set to meet on the sidelines of the APEC conference. Follow live updates

5. Xi Jinping faces a more skeptical US business community as he makes his case for investment

"The fidelity of the holographic surgical display is quite amazing, and the AI planned screws were right where I wanted them. HOLO Portal is truly next-generation technology, and even better it is straightforward and intuitive to adopt into a surgical technique," stated Dr. Chunduri, who joined Beacon Orthopedics & Sports Medicine in 2003. "Artificial intelligence and augmented reality promise to make surgery more efficient and safer, which is ultimately why I chose to integrate HOLO Portal into my practice."

In January 2022, the Company received U.S. Food & Drug Administration (FDA) 510(k) clearance for use of the HOLO Portal surgical guidance system within lumbar spine procedures. The Company is currently expanding the system's limited market release and intends to further increase site locations throughout the year. As cases are performed and data is accumulated, the Company plans to integrate new applications on its platform with the goal to both advance the quality of care and improve outcomes for patients.

"Congratulations to Dr. Chunduri for completing his first surgical case with the Surgalign™ HOLO Portal system," said Terry Rich, President and CEO of Surgalign. "The performance to date of the HOLO Portal system and the surgeon excitement generated by the technology have validated our high expectations. We believe that our HOLO AI technology will transform patient outcomes, and we couldn't be prouder to partner with Dr. Chunduri."

**About Surgalign Holdings, Inc.**

Surgalign Holdings, Inc. is a global medical technology company committed to the promise of digital health to drive transformation across the surgical landscape. Uniquely aligned and resourced to advance the standard of care, the company is building technologies physicians and other health providers will look to for what is truly possible for their patients. Surgalign is focused on developing solutions that predictably deliver superior clinical and economic outcomes. Surgalign markets products throughout the United States and in approximately 50 countries worldwide through an expanding network of top independent distributors. Surgalign is headquartered in Deerfield, IL, with commercial, innovation and design centers in San Diego, CA, Warsaw and Poznan, Poland, and Wurmlingen, Germany. Learn more at www.surgalign.com and connect on LinkedIn and Twitter.

**Forward Looking Statement**

This press release contains forward-looking statements based on management's current expectations, estimates and projections about our





NEWSROOM    SERVICES ⌄    CONTACT US    FRANÇAIS    SIGN IN    **REGISTER**



## Company Profile

**Surgalign Holdings, Inc.**

Website:
https://www.surgalig

## Press Release Actions

Print

Download PDF

Subscribe via RSS

Subscribe via ATOM

Javascript

# Surgalign Announces Third Quarter 2022 Results and Provides Update on Business Operations and Financial Outlook

November 02, 2022 16:01| Source: Surgalign Holdings, Inc.    Follow

ET

Share









DEERFIELD, Ill., Nov. 02, 2022 (GLOBE NEWSWIRE) -- Surgalign Holdings, Inc., (NASDAQ: SRGA) a global medical technology company focused on elevating the standard of care by driving the evolution of digital surgery, today announced financial results for its 2022 third quarter ended September 30, 2022.

**2022 Third Quarter Corporate Highlights:**

- Two new clinical sites in Ohio utilize the HOLO Portal™ surgical guidance system.
- FDA 510(k) clearance of the Cortera™ Spinal Fixation System, the first organically designed product by Surgalign.
- Expansion of the Fortilink® product portfolio with TiPlus™ technology products.
- Settlements with Resolve Surgical Technologies and RTI Surgical, Inc., and with the Securities and Exchange Commission related to prior management.
- Relaunch of the CervAlign® Anterior Cervical Plate system to support growth in the anterior cervical discectomy and fusion (ACDF) market.
- Launch of the Surgalign® Patient Access Program; strategic partnership with PRIA Healthcare.

"During the third quarter, we continued to make progress in bringing new products to market and made significant inroads in the commercialization of our HOLO Portal surgical guidance system with two new sites and several procedures performed,"



ongoing staffing challenges at hospitals in the U.S. As such, we believe we will hit our target of 10 to 15 sites by the end of the first quarter of 2023, with further expansion planned thereafter."

"Market challenges, particularly in Europe, coupled with the push out of HOLO Portal procedures has led us to revise our 2022 revenue guidance lower, though we anticipate sequential top-line improvement. Our number one priority from a corporate perspective, is ensuring we have the financial resources to carry through on our strategy as we transition to digital health. We remain in discussions with several parties and hope to have additional funding in place prior to year-end, though we may look at other measures in the short-term to provide additional time to consummate a third-party financing. In the interim, we continue to lower our expenses, without sacrificing innovation."

**Financial Update**

Total revenue for the three months ended September 30, 2022, was $20.2 million as compared to $20.5 million in the comparable year-ago period, a decline of $0.3 million. On a sequential basis when compared to the three months ended June 30, 2022, total revenue declined by $0.4 million. The decrease in revenue was primarily related to ongoing hospital and surgical center staffing shortages resulting in delays in procedures, securing new sites and procedures for HOLO Portal, as well as market and economic conditions in Europe. On a sequential basis, international revenue declined by $0.4 million, accounting for the majority of the decline for the comparable periods, with approximately $0.1 million related to foreign currency.

The Company reported gross margin of 72.8% for the three months ended September 30, 2022, as compared to gross margin of 66.8% in the comparable year-ago period, an improvement of 600 basis points. On a sequential basis when compared to the three months ended June 30, 2022, gross margin improved by 390 basis points. The year-over-year increase was primarily related to an improved product mix for



*18*

GlobeNewswire
by notified

NEWSROOM    SERVICES ⌄    CONTACT US    FRANÇAIS    SIGN IN    REGISTER

into the 2022 third quarter, as well as other sourcing strategies to address supply chain challenges.

On a non-GAAP basis, the Company reported adjusted gross margin of 74.9% for the three months ended September 30, 2022, as compared to adjusted gross margin of 69.1% in the comparable year-ago period, an improvement of 580 basis points. On a sequential basis when compared to the three months ended June 30, 2022, adjusted gross margin increased by 140 basis points.

Total operating expenses for the three months ended September 30, 2022 were $23.6 million as compared to $34.6 million in the comparable year-ago period, a decrease of $11.0 million or 31.9%. The primary drivers for the year-over-year improvement were a $5.4 million adjustment to the fair value of the Holo Surgical Inc. contract milestones and a $3.7 million decrease in general and administrative expenses as a result of cost-efficiency programs the Company continues to execute. Additionally, there was a decrease in asset impairment and abandonment expenses of $3.1 million related to the impairment of the Company's ERP system in 2021 and a reduction in capital expenditures during 2022. This was partially offset by a $1.0 million increase in research and development expenses related to the continued development of the HOLO AI™ platform and obtaining regulatory approval. On a sequential basis when compared to the three months ended June 30, 2022, total operating expenses declined by approximately $4.0 million.

On a non-GAAP basis, total adjusted operating expenses for the three months ended September 30, 2022 were $26.5 million, as compared to $28.7 million for the three months ended September 30, 2021. Excluded from non-GAAP operating expenses for the 2022 third quarter was a gain of $6.7 million due to adjustments to the fair value of Holo Surgical Inc. contract milestones, $2.3 million in asset impairment charges, non-cash stock-based compensation of $1.2 million, and $0.2 million in transaction and integration expenses. On a

*19*

GlobeNewswire
by notified

NEWSROOM    SERVICES⌄    CONTACT US    FRANÇAIS    SIGN IN    **REGISTER**

The Company reported an operating loss of $8.0 million for the three months ended September 30, 2022, as compared to an operating loss of $16.9 million in the comparable year-ago period. Net loss from continuing operations for the three months ended September 30, 2022 was $9.8 million, as compared to a net loss from continuing operations of $8.3 million in the comparable year-ago period.

Adjusted earnings before interest, taxes, depreciation and amortization (Adjusted EBITDA) for the three months ended September 30, 2022 was a loss of $11.2 million as compared to an Adjusted EBITDA loss of $13.6 million in the comparable year-ago period.

As of September 30, 2022, cash and cash equivalents were approximately $13.8 million, as compared to $29.3 million as of June 30, 2022, and $51.3 million reported as of December 31, 2021.

The Company is currently implementing a corporate-wide review of its organizational structure, processes and costs, along with continued product rationalization initiatives, efforts of which are currently underway. While these actions are expected to result in a significant reduction in operating expenses and a significant decrease in cash used in operating activities, and lead to a lower cost basis to operate the business in 2023, based on the current cash flow forecast, the Company's current net working capital available will not be sufficient to meet its anticipated cash needs beyond the early part of the first quarter of 2023. Efforts to raise additional capital from fundraising initiatives are currently underway to supplement the cash on hand to fund operations through the end of the first quarter of 2023, and potentially long-term, depending on the financing options available to the Company.

**Fiscal 2022 Business Outlook**

In light of the current economic and market environment, which is expected to result in lower than expected international revenue and delays in finalizing contracts for new sites and



now expects to have 10 to 15 sites secured by the end of the 2023 first quarter, taking into account delays brought about by administrative staffing challenges. Surgalign expects both top- and bottom-line improvements in 2023 based on increased market demand for new product offerings, and opportunities for the HOLO Portal and other applications in development.

## Conference Call

Surgalign will host a conference call and audio webcast at 4:30 p.m. ET today. The conference call can be accessed by dialing (866) 604-1616 (U.S.) or (201) 689-8043 (International). The webcast can be accessed through the investor section of Surgalign's website at surgalign.com/investors/. A replay of the conference call will be available on Surgalign's website for one month following the call.

## About Surgalign Holdings, Inc.

Surgalign Holdings, Inc. is a global medical technology company committed to the promise of digital health to drive transformation across the surgical landscape. Uniquely aligned and resourced to advance the standard of care, the company is building technologies physicians and other health providers will look to for what is truly possible for their patients. Surgalign is focused on developing solutions that predictably deliver superior clinical and economic outcomes. Surgalign markets products throughout the United States and in approximately 50 countries worldwide through an expanding network of top independent distributors. Surgalign is headquartered in Deerfield, IL, with commercial, innovation and design centers in San Diego, CA, Warsaw and Poznan, Poland, and Wurmlingen, Germany. Learn more at www.surgalign.com and connect on LinkedIn and Twitter.

## Forward Looking Statements

This press release contains forward-looking statements based on management's current expectations, estimates and projections about our industry, our management's beliefs and certain assumptions made by our management, and such

21



# Surgalign™ Expands Adoption of its HOLO Portal™ Surgical Guidance System in Virginia

### Richmond, VA medical facility is fourth to clinically use HOLO Portal, the world's first artificial intelligence (AI)-driven, augmented reality (AR) guidance system for spine surgery

December 13, 2022 12:00 | Source: Surgalign Holdings, Inc.
ET

**Follow**

Share





DEERFIELD, Ill., Dec. 13, 2022 (GLOBE NEWSWIRE) -- Surgalign Holdings, Inc., (NASDAQ: SRGA) a global medical technology company focused on elevating the standard of care by driving the evolution of digital health, today announced additional commercialization of its HOLO Portal surgical guidance system. The Company is pleased to report that multiple cases have been successfully performed in Virginia leveraging the HOLO Portal system, with the first case performed by Joshua P. Herzog, MD, a board-certified orthopedic spine surgeon with OrthoVirginia in Richmond, Virginia.

HOLO Portal is the world's first surgical guidance system to incorporate AI and AR. This is the first clinical application of Surgalign's HOLO™ AI digital health platform. The system's AI processes intraoperative images to autonomously segment and label the anatomy and plan patient-specific pedicle screw trajectories that are approved by the surgeon. The HOLO Portal system uses AR to overlay the segmented AI reconstruction over the patient's actual anatomy, providing real-time 3D

Company Profile

Surgalign Holdings, Inc.

Website:
https://www.surgalig

Press Release Actions

Print
Download PDF
Subscribe via RSS
Subscribe via ATOM
Javascript

22

In January 2022, Surgalign received U.S. Food & Drug Administration (FDA) 510(k) clearance for use of the HOLO Portal system within lumbar spine procedures. The Company is currently working to expand the system's limited market release and intends to further increase its site locations throughout the year. As cases are performed and data is accumulated, the Company also intends to integrate new applications on its platform to advance the quality of care and improve outcomes for patients.

"I am confident that the increased precision and ability of this enabling technology will improve the recovery and outcome for my patients," said Dr. Herzog. Terry Rich, President and CEO of Surgalign, added, "Congratulations to Dr. Herzog and the team at OrthoVirginia for completing the first clinical case in Virginia with the Surgalign HOLO Portal system. The performance of the system to date coupled with the positive surgeon feedback generated by the technology, continues to validate our high expectations and drive our overall goal to transform patient outcomes with our AI technology."

**About Surgalign Holdings, Inc.**
Surgalign Holdings, Inc. is a global medical technology company committed to the promise of digital health to drive transformation across the surgical landscape. Uniquely aligned and resourced to advance the standard of care, the company is building technologies physicians and other health providers will look to for what is truly possible for their patients. Surgalign is focused on developing solutions that predictably deliver superior clinical and economic outcomes. Surgalign markets products throughout the United States and in approximately 50 countries worldwide through an expanding network of top independent distributors. Surgalign is headquartered in Deerfield, IL, with commercial, innovation and design centers in San Diego, CA, Warsaw and Poznan, Poland, and Wurmlingen, Germany. Learn more at www.surgalign.com and connect on LinkedIn, Twitter and Instagram.

23





## Medical City Frisco is the Latest Hospital to Utilize Surgalign's HOLO Portal Surgical Guidance System

This represents the first site in Texas; Medical City Frisco to leverage the benefits of HOLO Portal, the world's first artificial intelligence (AI)-driven, augmented reality (AR) system for spine surgery

March 02, 2023 08:30 ET    | Source: Surgalign Holdings, Inc.    [Follow]

**Company Profile**

Surgalign Holdings, Inc.

Website:
https://www.surgalig

**Press Release Actions**

Print

Download PDF

Subscribe via RSS

Subscribe via ATOM

Javascript

**Share**

 f

in

reddit

✉

⊞

DEERFIELD, Ill., March 02, 2023 (GLOBE NEWSWIRE) -- Surgalign Holdings, Inc. (Nasdaq: SRGA), a global medical technology company focused on elevating the standard of care by driving the evolution of digital surgery, today announced that Medical City Frisco, a world-class acute care hospital in Frisco, TX and part of HCA Healthcare, is the latest medical facility to clinically use its HOLO Portal Surgical Navigation System. The last procedure was performed by Dr. Ripul Panchal, DO, a board-certified, fellowship-trained neurosurgeon with expertise in the management of spinal disorders.

Terry Rich, President and CEO of Surgalign commented, "I would like to congratulate Dr. Panchal and his team for being the first adopters of HOLO Portal in Texas and for their ongoing commitment to improving patient outcomes, a vision we share at Surgalign. Since HOLO Portal was launched, over 30 cases have been performed. While the sales process has proven to be longer than anticipated, our pipeline continues to grow, and we have gathered insights from the medical community which will in turn, improve system functionality. We have system



our customers further."

Dr. Panchal added, "I was an early adopter of augmented reality technology in the OR and am pleased to be moving to the next generation technology offered by HOLO Portal. Its unique holographic display is more comfortable to use than typical AR headsets, while the integrated AI enhances both the image quality and workflow." Dr. Panchal is a board certified, fellowship-trained neurosurgeon with expertise in management of spinal disorders. He served as Director of the Spine Fellowship Program and as Assistant Professor in the Department of Neurological Surgery at University of California, Davis School of Medicine for five years. He specializes in neurological surgery and spine surgery and is affiliated with Medical City McKinney, Medical City Frisco, and Sarah Cannon Cancer Institute. He actively practices at the American Neurospine Institute, PLLC in Plano, TX.

Surgalign received U.S. Food & Drug Administration (FDA) 510(k) clearance for use of the HOLO Portal system within lumbar spine procedures in January 2022. With FDA clearance, HOLO Portal became the world's first surgical guidance system to incorporate AI and AR. The HOLO Portal system's AI processes intraoperative images to autonomously segment and label the anatomy and plan patient-specific pedicle screw trajectories that are approved by the surgeon. The system uses AR to overlay the segmented AI reconstruction over the patient's actual anatomy, providing real-time 3D visualization throughout the surgical procedure, helping surgeons visualize trajectories, while guiding surgical instruments. Five medical facilities have utilized HOLO Portal since May 2022 and there have been over 30 cases performed to date.

**About Surgalign Holdings, Inc.**

Surgalign Holdings, Inc. is a global medical technology company committed to the promise of digital health to drive transformation across the surgical landscape. Uniquely aligned and resourced to advance the standard of care, the company is building technologies physicians and other health providers will



 **Surgalign Announces Release of HOLO™ AI Insights for ...** 



# Surgalign Announces Release of HOLO™ AI Insights for Neurovascular Research

### New HOLO AI Insights application aims to advance research of neuroanatomy utilizing artificial intelligence

May 08, 2023 08:30 ET    | Source: Surgalign Holdings, Inc.    **Follow**

## Company Profile

Surgalign Holdings, Inc.

Website:
https://www.surgalig

## Press Release Actions

Print

Download PDF

Subscribe via RSS

Subscribe via ATOM

Javascript

**Share**

 f

 in





DEERFIELD, Ill., May 08, 2023 (GLOBE NEWSWIRE) -- Surgalign Holdings, Inc., (NASDAQ: SRGA) a global medical technology company focused on elevating the standard of care by driving the evolution of digital health, is proud to announce today, the release of HOLO™ AI Insights for use in neurovascular research.

HOLO AI Insights, initially launched in March 2023 for spine imaging, enables customers, partners, and clinical researchers to take advantage of the Company's HOLO artificial intelligence (AI) portfolio through a secure, highly scalable cloud platform for automated analysis of medical images. HOLO AI, Surgalign's portfolio of AI technology, utilizes convolutional neural network technology to automatically segment medical images, measure anatomic structures, automate pedicle screw planning, and perform other tasks.

With this latest release, HOLO AI Insights has evolved to now address neurovascular research. This latest addition to the Company's portfolio, can analyze large sets of cranial MRI images, automatically identify 16 different structures, and aggregate the data for the user into configurable graphical and



 **Surgalign Announces Release of HOLO™ AI Insights for ...** ☰

research, and in the future, patient care.

Surgalign has partnered with Dr. Brian Jankowitz, a fellowship trained cerebrovascular neurosurgeon, for neurovascular research with HOLO AI Insights. "Most of the AI work done in the neurovascular space has focused on acute care with CT imaging and doesn't help with measurement. HOLO AI Insights can automate volumetric analysis of vascular structures on MRI, which is a big leap forward in efficiency and more applicable to longitudinal comparisons than other tools available today," said Dr. Jankowitz. "I believe that ultimately this technology will both speed our workflow and improve clinical guidelines by providing a significantly more detailed characterization of neurovascular structures."

Dr. Jankowitz, MD is a neurosurgery specialist with extensive experience in Neurocritical Care Disorders. He is affiliated with the medical facilities Hospital of the University of Pennsylvania and Cooper University Hospital. He previously served as an associate professor of neurological surgery at the University of Pittsburgh School of Medicine and served as faculty of the UPMC Neurosurgery Department and UPMC Stroke Institute where he specialized in both open and endovascular neurosurgery. Dr. Jankowitz earned a bachelor of science degree from the University of Notre Dame and received his medical degree from Temple University School of Medicine.

"It's an honor to partner with Dr. Jankowitz with a shared goal of advancing technology utilized by neuroanatomy researchers," said Terry Rich, President and Chief Executive Officer of Surgalign. "Collecting patient-specific medical information from multiple sites to generate population level reports using AI technology holds tremendous promise to improve our knowledge of the brain. We believe processing larger volumes of data is an invaluable step to generate reference information to help medical professionals as we continue to look for new ways to leverage our AI portfolio."

HOLO AI also powers Surgalign's HOLO Portal™ surgical guidance system and HOLO AI Insights for Spine. The addition of HOLO AI Insights for neuroanatomy is a further step in

*27*

 **Surgalign Announces Release of HOLO™ AI Insights for ...**    ≡

HOLO AI Insights is not intended to be used for patient treatment. Learn more at https://www.holo.ai.

**About Surgalign Holdings, Inc.**

Surgalign Holdings, Inc. is a global medical technology company committed to the promise of digital health to drive transformation across the surgical landscape. Uniquely aligned and resourced to advance the standard of care, the company is building technologies physicians and other health providers will look to for what is truly possible for their patients. Surgalign is focused on developing solutions that predictably deliver superior clinical and economic outcomes. Surgalign markets products throughout the United States and in approximately 50 countries worldwide through an expanding network of top independent distributors. Surgalign is headquartered in Deerfield, IL, with commercial, innovation and design centers in San Diego, CA, Warsaw and Poznan, Poland, and Wurmlingen, Germany. Learn more at www.surgalign.com and connect on LinkedIn and Twitter.

**Forward Looking Statement**

This press release contains forward-looking statements based on management's current expectations, estimates and projections about our industry, our management's beliefs and certain assumptions made by our management, and such forward-looking statements include (among others) statements regarding anticipated future financial and operating performance (including forecasted full-year revenue and number of HOLO sites secured), product rationalization and expense reduction initiatives and the results thereof, potential third party financing and anticipated cash needs. Words such as "anticipates," "expects," "intends," "plans," "believes," "seeks," "estimates," variations of such words and similar expressions are intended to identify such forward-looking statements. The forward-looking statements are not guarantees of future performance and are based on certain assumptions including general economic conditions, as well as those within the Company's industry, and numerous other factors and risks identified in the Company's most recent Form 10-K, 10-Q and



 



# Surgalign Announces First Quarter 2023 Results and Provides Update on its Business Operations

May 11, 2023 16:01 ET| Source: Surgalign Holdings, Inc.   [ Follow ]

---

DEERFIELD, Ill., May 11, 2023 (GLOBE NEWSWIRE) -- Surgalign Holdings, Inc., (NASDAQ: SRGA) a global medical technology company focused on elevating the standard of care by driving the evolution of digital surgery, today announced financial results for its 2023 first quarter ended March 31, 2023.

**2023 First Quarter and Subsequent Corporate Highlights:**

- Launch of HOLO™ AI Insights for Spine Imaging; collaboration with Dr. Alexander Vaccaro, Dr. Pierce Nunley and Spine Institute of Louisiana, and leading neuro and orthopedic spine surgeons and San Diego Spine Foundation.

- Launch of HOLO AI Insights for Neurovascular Research; collaboration with Dr. Brian Jankowitz, a fellowship trained cerebrovascular neurosurgeon, for neurovascular research.

- HOLO Portal™ Surgical Guidance System ("HOLO Portal") upgrades unveiled; next generation software and new surgical tool integration to improve system functionality and drive further adoption.

- Two new sites added in May 2023 for HOLO Portal; onboarding underway with cases to be scheduled.

- HOLO Portal expansion into Texas; first case performed by Dr. Ripul Panchal, DO of Medical City Frisco, part of HCA Healthcare.

- Sale of its Coflex® and CoFix™ product lines for $17.0 million, raising net proceeds of $14.8 million.

"Throughout 2023, we have advanced our HOLO AI portfolio with an upgraded HOLO Portal system, and the launch of HOLO AI Insights for research-use for both spine imaging and

## Company Profile

Surgalign Holdings, Inc.

Website:
https://www.surgalig

## Press Release Actions

Print
Download PDF
Subscribe via RSS
Subscribe via ATOM
Javascript

Share
f
in
(reddit icon)
✉
⊞

29

 **Surgalign Announces First Quarter 2023 Results and Pr...**  ≡

feedback from the medical community, and we couldn't be happier to be working with such world-class physicians to harness the full potential of artificial intelligence. We are focused on further enhancements to our AI platform with a goal to expedite commercialization efforts as we capitalize on the Digital Health opportunity."

Mr. Rich continued, "With the sale of our Coflex and CoFix product lines in February, we strengthened our balance sheet and extended our cash runway, while our restructuring initiatives are progressing accordingly to plan. We will remain vigilant in our capital allocation and continue to explore strategic paths to improve liquidity and provide the resources needed to execute on our vision."

**Financial Update**

Total revenue for the three months ended March 31, 2023 was $16.7 million as compared to $20.6 million in the comparable year-ago period, a decline of $3.9 million. On a sequential basis when compared to the three months ended December 31, 2022, total revenue declined by $3.9 million. The sequential decrease in revenue was primarily related to a significant reduction in product offerings as part of the Company's ongoing restructuring efforts, lower international revenue resulting from wind down of the international business, and lost revenue from the sale of the Coflex® and CoFix™ product lines in February 2023.

The Company reported gross margin of 63.7% for the three months ended March 31, 2023, as compared to gross margin of 68.9% in the comparable year-ago period, a reduction of 520 basis points. On a sequential basis when compared to the three months ended December 31, 2022, gross margin improved by 7730 basis points. The sequential increase in gross profit was primarily related to product rationalization initiatives during the fourth quarter of 2022, which led to significant charges to cost of goods sold in that period.



 **Surgalign Announces First Quarter 2023 Results and Pr...**   ☰

compared to adjusted gross margin of 70.9% in the comparable
year-ago period, a reduction of 140 basis points. On a sequential
basis when compared to the three months ended December 31,
2022, adjusted gross margin decreased by 240 basis points.

Total operating expenses for the three months ended March 31,
2023 were $24.4 million as compared to $23.1 million in the
comparable year-ago period, an increase of $1.3 million or 5.8%.
On a sequential basis when compared to the three months
ended December 31, 2022, total operating expenses declined by
approximately $20.9 million. The primary drivers for the
sequential improvement in operating expenses were a
$17.5 million decline in transaction and financing expenses
related to the Company's November 2022 warrant offering, and
a $1.3 million decline in general and administrative expenses,
primarily related to restructuring.

On a non-GAAP basis, total adjusted operating expenses for the
three months ended March 31, 2023 were $23.0 million, as
compared to $28.4 million for the three months ended March 31,
2022. Excluded from non-GAAP operating expenses for the 2023
first quarter was a gain of $1.1 million due to adjustments to the
fair value of Holo Surgical Inc. contingent consideration,
$0.6 million in asset impairment charges, $1.0 million in non-
cash stock-based compensation, $0.5 million in transaction and
financing expenses, and $0.5 million in severance and
restructuring costs. On a sequential basis when compared to
the three months ended December 31, 2022, total adjusted
operating expenses declined by approximately $1.6 million.

The Company reported an operating loss of $1.1 million for the
three months ended March 31, 2023, as compared to an
operating loss of $8.9 million in the comparable year-ago period
and an operating loss of $48.2 million for the three months
ended December 31, 2022. Net income from continuing
operations for the three months ended March 31, 2023 was
$4.1 million. This compares to net income from continuing
operations of $0.0 million in the comparable year-ago period
and a net loss from continuing operations of $39.1 million for the
three months ended December 31, 2022.

31

 **Surgalign Announces First Quarter 2023 Results and Pr...**    ≡

March 31, 2023 was a loss of $10.8 million. This compares to an Adjusted EBITDA loss of $13.3 million in the comparable year-ago period and an Adjusted EBITDA loss of $9.1 million for the three months ended December 31, 2022.

As of March 31, 2023, cash and cash equivalents were approximately $22.4 million, as compared to $16.3 million reported as of December 31, 2022.

The Company continues to implement a corporate-wide review of its organizational structure, processes and costs, along with continued product rationalization initiatives. The restructuring plan began during the fourth quarter of 2022 and continues today.

**Conference Call**

Surgalign will host a conference call and audio webcast at 4:30 p.m. ET today. The conference call can be accessed by dialing (888) 437-3179 (U.S.) or (862) 298-0702 (International). The webcast can be accessed through the investor section of Surgalign's website at surgalign.com/investors/. A replay of the conference call will be available on Surgalign's website for one month following the call.

**About Surgalign Holdings, Inc.**

Surgalign Holdings, Inc. is a global medical technology company committed to the promise of digital health to drive transformation across the surgical landscape. Uniquely aligned and resourced to advance the standard of care, the company is building technologies physicians and other health providers will look to for what is truly possible for their patients. Surgalign is focused on developing solutions that predictably deliver superior clinical and economic outcomes. Surgalign markets products throughout the United States and in approximately 40 countries worldwide through its network of top independent distributors. Surgalign is headquartered in Deerfield, IL, with commercial, innovation and design centers in San Diego, CA, Warsaw and Poznan, Poland, and Wurmlingen, Germany. Learn more at www.surgalign.com and connect on LinkedIn and Twitter.

*32*

# Exhibit C

## Notice Of Non-Voting Status for Holders Of Impaired Claims

Introduction

**IN THE UNITED STATES BANKRUPTCY COURT FOR
THE SOUTHERN DISTRICT OF TEXAS HOUSTON
DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| **SURGALIGN HOLDINGS, INC.**, *et al.*,[1] | Case No. 23-90731 (CML) |
| | (Jointly Administered) |
| Debtors. | |

NOTICE OF NON-VOTING STATUS TO HOLDERS OF IMPAIRED CLAIMS

OR INTERESTS CONCLUSIVELY DEEMED TO REJECT THE PLAN

**PLEASE TAKE NOTICE THAT** on August 31, 2023, the United States Bankruptcy Court for the Southern District of Texas (the "**Court**") entered an order [Docket No. 406] (the "**Disclosure Statement Order**"): (a) authorizing the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") to solicit votes on the *Combined Disclosure Statement and Joint Chapter 11 Plan of Surgalign Holdings, Inc. and Its Affiliated Debtors* [Docket No. 431] (as may be amended, supplemented, or modified from time to time and including all exhibits and supplements thereto, the "**Plan**" or "**Disclosure Statement**" or "**Plan and Disclosure Statement**," as applicable);[2] (b) conditionally approving the Disclosure Statement as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages; (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the final approval of the Disclosure Statement and confirmation of the Plan; and (e) scheduling certain dates with respect thereto.

**PLEASE TAKE FURTHER NOTICE THAT** because of the nature and treatment of your Claim or Interest under the Plan, *you are not entitled to vote on the Plan.* Specifically, under the terms of the Plan, as a Holder of a Claim (as currently asserted against the Debtors) or Interest in the Debtors that is Impaired and conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, you are *not* entitled to vote on the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing to consider final approval of the Disclosure Statement and confirmation of the Plan (the "**Combined Hearing**") will commence on **September 27, 2023 at 9:00 a.m.** (prevailing Central Time) before the Honorable Christopher M. Lopez, in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street, Courtroom 401, Houston, Texas, 77002. Please be advised that the Combined Hearing may be continued from time to time by the Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Court and served on other parties entitled to notice.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to confirmation of the Plan, including with respect to the treatment of Executory Contracts and Unexpired Leases thereunder, and the adequacy of the Disclosure Statement, is **September 25, 2023 at 12:00 p.m. (prevailing Central Time)** (the "**Plan and Disclosure Statement Objection Deadline**"). Any objection to the relief sought at the Combined Hearing *must*: (a) be in writing; (b) comply with the Bankruptcy Rules, the Bankruptcy Local Rules, and any orders of the Court; (c) state, with particularity, the legal and factual bases for the objection and, if practicable, a proposed modification to the Disclosure Statement or Plan (or related materials) that would resolve such objection; and (d) be filed with the Court on or before the Plan and Disclosure Statement Objection Deadline.

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain copies of the Disclosure State Order, the Plan and Disclosure Statement, the Solicitation and Voting Procedures, the Plan Supplement, or related documents, such materials are available free of charge by: (a) accessing the Debtors' restructuring website at https://restructuring.ra. kroll.com/surgalign; (b) writing to Surgalign Holdings, Inc., c/o Kroll Restructuring Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, NY 11232; (c) calling (833) 939-6015 (U.S./Canada toll free) or +1 (646) 440-4843 (International for calls originating outside of the U.S./Canada); or (d) emailing surgalgninfo@ra.kroll.com (with "Surgalign Holdings, Inc. Solicitation" in the subject line). You may also obtain copies of any pleadings filed in the chapter 11 cases for a fee via PACER at http://www.txs.uscourts.gov.

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number (if any), are: Surgalign Holdings, Inc. (0607); Surgalign Spine Technologies, Inc. (6543); Pioneer Surgical Technology NewCo Inc.; Spinal Transition and Professional Services LLC; Andi's Belmarall, LLC; Fourth Dimension Spine, LLC (1107); Holo Surgical Inc. (4079); and HoloSurgical Technology Inc. (0962). The location of the debtors' service address in these chapter 11 cases is: 520 Lake Cook Road, Suite 315, Deerfield, Illinois 60015.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan and Disclosure Statement, or the Disclosure Statement Order, as applicable.

**ARTICLE XII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND ARTICLE XII.C CONTAINS A THIRD- PARTY RELEASE. YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.**

**ALL HOLDERS OF CLAIMS OR INTERESTS THAT DO NOT ELECT TO OPT OUT OF THE THIRD-PARTY RELEASE CONTAINED IN ARTICLE XII.C OF THE PLAN USING THE ENCLOSED OPT-OUT FORM WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE OF ALL CLAIMS AND CAUSES OF ACTION RELEASED THEREUNDER AGAINST THE DEBTORS AND OTHER RELEASED PARTIES. IF YOU ELECT TO OPT OUT OF THE RELEASE SET FORTH IN ARTICLE XII.C OF THE PLAN, YOU WILL RECEIVE THE SAME RECOVERY AND TREATMENT ON ACCOUNT OF YOUR CLAIM UNDER THE PLAN.**

Houston, Texas
September 1, 2023

*/s/ Veronica A. Polnick*

**JACKSON WALKER LLP**

Veronica A. Polnick (TX Bar No. 24079148)
J. Machir Stull (TX Bar No. 24070697)
Matthew D. Cavenaugh (TX Bar No. 24062656)
McKinney Street, Suite 1900
1401 McKinney Street, Suite 1900
Houston, Texas 77010

| | |
|---|---|
| Telephone: | (713) 752-4200 |
| Email: | vpolnick@jw.com |
| | mstull@jw.com |
| | mcavenaugh@jw.com |

**WHITE & CASE LLP**

Gregory F. Pesce (admitted *pro hac vice*)
Laura E. Baccash (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100 1401
Chicago, Illinois 60606

| | |
|---|---|
| Telephone: | (312) 881-5400 |
| Email: | gregory.pesce@whitecase.com |
| | laura.baccash@whitecase.com |

Charles R. Koster (TX Bar No. 24128278)
609 Main Street, Suite 2900
Houston, Texas 77002
Telephone:     (713) 496-9700
Email:          charles.koster@whitecase.com

Barrett Lingle (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone:     (212) 819-8200
Email:          barrett.lingle@whitecase.com

*Co-Counsel to the Debtors and Debtors in Possession*

*Co-Counsel to the Debtors
and Debtors in Possession*

## OPTIONAL: RELEASE OPT-OUT FORM

You are receiving this opt-out form (the "**Opt-Out Form**") because you are or may be a Holder of a Claim or Interest that is not entitled to vote on the *Combined Disclosure Statement and Joint Chapter 11 Plan of Surgalign Holdings, Inc. and Its Affiliated Debtors* (as may be amended, supplemented, or modified from time to time and including all exhibits and supplements thereto, the "**Plan**" or "**Disclosure Statement**" or "**Plan and Disclosure Statement**," as applicable). To the extent the Plan is confirmed, Holders of Claims or Interests are deemed to grant the third-party release (the "**Third-Party Release**") set forth in the Plan and reproduced in this notice unless such Holder affirmatively opts out of the releases by completing and returning this form in accordance with the directions herein on or before **September 22, 2023 at 5: 00 p.m. (prevailing Central Time)** (the "**Opt-Out Deadline**").

If you believe you are a Holder of a Claim or Interest with respect to the Debtors and choose to opt- out of the Third-Party Release set forth in Article XII. C of the Plan, please promptly complete, sign, and date this Opt-Out Form and return it via first class mail, overnight courier, or hand delivery to Kroll Restructuring Administration, LLC (the "**Solicitation Agent**") at the address set forth below. Alternatively, Holders are strongly encouraged to submit their Opt-Out Form electronically through the Solicitation Agent's online E-Ballot Portal (the "**the E-Ballot Portal**"), per the instructions set forth below and at the "Submit E-Ballot" section of the Debtors' restructuring website https://restructuring.ra.kroll.com/surgalign. Parties that submit their Opt-Out Form using the E- Ballot Portal should **NOT** also submit a paper Opt-Out Form.

**THIS OPT-OUT FORM MUST BE ACTUALLY RECEIVED BY THE SOLICITATION AGENT BY THE OPT-OUT DEADLINE. IF THE OPT- OUT FORM IS RECEIVED AFTER THE OPT- OUT DEADLINE, IT WILL NOT BE COUNTED**

## Item 1. Important information regarding the Third-Party Release.

Item 1.  Important information regarding the Third-Party Release.[9]

Article XII.C of the Plan contains the following Third-Party Release:

Except as otherwise specifically provided in the Plan, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released by the Releasing Parties, and any and all other Entities who may purport to assert any Claims or Causes of Action, directly or derivatively, by, through, for, or because of the Releasing Parties, from any and all Claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or noncontingent, in law, equity, contract, tort or otherwise, including any derivative claims, asserted or assertable on behalf of the Debtors or their Estates, as applicable, that such Entity would have been legally entitled to assert, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including management, ownership, or operation thereof), the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, pursuit, performance, or consummation of the Chapter 11 Cases (including, without limitation, any payments, distributions or transfers in connection therewith), the Plan and Disclosure Statement, the Digital Assets Sale Transaction, the Hardware Assets Sale Transaction, the Digital Assets Sale Transaction Documents, the Hardware Assets Sale Transaction Documents, or any contract, instrument, release, or other Plan Document, agreement, or document created or entered into with the Plan and Disclosure Statement, the Chapter 11 Cases, the Digital Assets Sale Transaction, the Hardware Assets Sale Transaction, Confirmation, or Consummation, the administration and implementation of the Plan, including the distribution of property under the Plan or any other related agreement, any payments, distributions or transfers made by the Debtors during the Chapter 11 Cases, any settlement or agreement in the Chapter 11 Cases or upon the negotiations regarding or concerning any of the foregoing or any other act or omission, transaction, agreement, event, or other occurrence relating to the foregoing taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth in this Article XII.C do not release: (a) any post-Effective Date obligations of any party or Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; or (b) any rights or obligations under any Digital Assets Sale Transaction Document or Hardware Assets Sale Transaction Document.

UNDER THE PLAN, *"RELEASED PARTY"* MEANS EACH OF, AND IN EACH CASE, IN ITS CAPACITY AS SUCH: (A) THE COMMITTEE AND EACH OF ITS MEMBERS; (B) THE PLAN ADMINISTRATOR; (C) WITH RESPECT TO EACH DEBTOR AND EACH OF ITS DIRECT OR INDIRECT NON-DEBTOR SUBSIDIARIES, THE FOLLOWING PERSONS OR ENTITIES: (I) TERRY RICH, (II) DAVID LYLE, (III) CHRIS THUNANDER, (IV) PAOLO AMORUSO, (V) SUZANNE ZOUMARAS, (VI) MARC MACKEY, (VII) SHERYL CONLEY, (VIII) MARK STOPLER, (IX) THOMAS MCEACHIN, (X) PAUL THOMAS, (XI) NICOLAS VALERIANI, (XII) JILL FRIZZLEY, AND (XIII) ELIZABETH LAPUMA; AND (D) EACH OF THE DEBTORS' AND THE COMMITTEE'S PROFESSIONALS.[4]

UNDER THE PLAN, *"RELEASING PARTY"* MEANS EACH OF, AND IN EACH CASE, IN ITS CAPACITY AS SUCH: (A) THE COMMITTEE AND EACH OF ITS MEMBERS; (B) THE PLAN ADMINISTRATOR; (C) EACH HOLDER OF CLAIMS OR INTERESTS THAT VOTES TO ACCEPT THE PLAN; (D) EACH HOLDER OF CLAIMS OR INTERESTS THAT (I) ABSTAINS FROM VOTING ON THE PLAN AND WHO DOES NOT OPT OUT OF THE RELEASES IN THE PLAN, (II) VOTES TO REJECT THE PLAN AND WHO DOES NOT OPT OUT OF THE RELEASES IN THE PLAN, OR

(III) IS PRESUMED TO ACCEPT OR DEEMED TO REJECT THE PLAN AND WHO DOES NOT OPT OUT OF THE RELEASES IN THE PLAN; (E) EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (C) AND (D); (F) WITH RESPECT TO EACH DEBTOR AND EACH OF ITS DIRECT OR INDIRECT NON-DEBTOR SUBSIDIARIES, THE FOLLOWING PERSONS OR ENTITIES: (I) TERRY RICH, (II) DAVID LYLE, (III) CHRIS THUNANDER, (IV) PAOLO AMORUSO, (V) SUZANNE ZOUMARAS, (VI) MARC MACKEY, (VII) SHERYL CONLEY, (VIII) MARK STOPLER, (IX) THOMAS MCEACHIN, (X) PAUL THOMAS, (XI) NICOLAS VALERIANI, (XII) JILL FRIZZLEY, AND (XIII) ELIZABETH LAPUMA; AND (G) EACH OF THE DEBTORS' AND THE COMMITTEE'S PROFESSIONALS.

NOTWITHSTANDING THE FOREGOING, AN ENTITY SHALL NOT BE A RELEASING PARTY IF IT VALIDLY OPTS OUT OF THE RELEASE CONTAINED IN ARTICLE XII.C OF THE PLAN.

[3] The Plan provisions referenced herein are for summary purposes only and do not include all provisions of the Plan that may affect your rights. If there is any inconsistency between the provisions set forth herein and the Plan, the Plan governs. Please read the Plan carefully before completing this Opt-Out Form.

[4] The Special Committee of the Board of Directors of Surgalign Holdings, Inc. in consultation with counsel to the Committee, is continuing to investigate the releases by the Debtors of Claims and Causes of Action prior to the Confirmation Hearing. The Debtors reserve the right, in consultation with counsel to the Committee, to amend the Plan, including to modify the Released Parties.

IMPORTANT INFORMATION REGARDING THE RELEASES:

AS A HOLDER OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS, YOU ARE A "RELEASING PARTY" UNDER THE PLAN AND ARE DEEMED TO PROVIDE THE RELEASE CONTAINED IN ARTICLE XII.C OF THE PLAN, AS SET FORTH ABOVE, AND EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENT TO THE RELEASE OF ALL CLAIMS AND CAUSES OF ACTION RELEASED THEREUNDER AGAINST THE DEBTORS AND OTHER RELEASED PARTIES.

Notice Of Non-Voting Status for Holders Of Impaired Claims

YOU MAY CHECK THE BOX BELOW TO ELECT NOT TO GRANT THE RELEASE CONTAINED IN ARTICLE XII.C OF THE PLAN. YOU WILL NOT BE CONSIDERED A "RELEASING PARTY" UNDER THE PLAN IF YOU CHECK THE BOX BELOW AND SUBMIT THIS OPT OUT FORM BY THE OPT-OUT DEADLINE. THE ELECTION TO WITHHOLD CONSENT TO GRANT THE THIRD- PARTY RELEASE IS AT YOUR OPTION. YOU WILL RECEIVE THE SAME TREATMENT ON ACCOUNT OF YOUR CLAIM(S) OR INTEREST(S) UNDER THE PLAN REGARDLESS OF WHETHER YOU ELECT TO NOT GRANT THE RELEASE CONTAINED IN ARTICLE XII.C OF THE PLAN.

**OPTIONAL RELEASE ELECTION.** YOU MAY ELECT TO OPT OUT OF THE RELEASE CONTAINED IN ARTICLE XII.C OF THE PLAN ONLY IF YOU CHECK THE BOX BELOW:

☑ The Undersigned holder of the Claim or Interest elects to OPT OUT of the Third-Party Release

## Item 2. Certifications.

By signing this Opt-Out Form, the undersigned certifies to the Court and the Debtors that:

(a)   as of the Voting Record Date, either: (i) the Entity is the Holder of a Claim or Interest; or (ii) the Entity is an authorized signatory for the Entity that is a Holder of a Claim or Interest;

(b)   the Entity has received a copy of the *Notice of Non-Voting Status to Holders of Impaired Claims or Interests Conclusively Deemed to Reject the Plan* and that this Opt-Out Form is made pursuant to the terms and conditions set forth therein;

(c)   the Entity has submitted the same respective election concerning the releases with respect to all Claims in a single Class; and

(d)   no other Opt-Out Form has been submitted or, if any other Opt-Out Forms have been submitted with respect to such Claims or Interests, then any such earlier Opt-Out Forms are hereby revoked.

Name of Holder

| Ryan Messner |
|---|

Do you wish to sign electronically or upload a signature page?

● Sign electronically
○ Upload signature page

Signature



Notice Of Non-Voting Status for Holders Of Impaired Claims

Name of Signatory

Ryan Messner

Title

Common Shareholder

Address

570 Camphor Way, Lexington, KY 40509

Telephone Number:

859-559-7985

Email address:

ryanmessner@hotmail.com

Date Completed

20/9/2023

**IF YOU HAVE MADE THE OPTIONAL OPT OUT ELECTION, PLEASE COMPLETE, SIGN, AND DATE THIS OPT-OUT FORM AND RETURN IT PROMPTLY BY ONLY ONE OF THE METHODS BELOW.**

**By first class mail, overnight courier, or hand delivery to:**

Surgalign Holdings, Inc. Ballot Processing

c/o Kroll Restructuring Administration LLC

850 Third Avenue, Suite 412

Brooklyn, NY 11232

**If you would like to coordinate hand delivery of your Opt-Out Form, please email surgaligninfo@ra.kroll. com. (with "Surgalign Solicitation Opt-Out" in the subject line) at least 24 hours prior to your arrival at the Kroll address above and provide the anticipated date and time of your delivery.**

**OR**

**By electronic, online submission:**

Please visit https://restructuring.ra.kroll.com/surgalign (the **"E-Ballot Portal"**). Click on the "Submit E-Ballot" section of the Debtors' website and follow the instructions to submit your Opt- Out Form. If you choose to submit your electronic Opt-Out Form via the E-Ballot Portal, you **SHOULD NOT** also return a hard copy of your Opt-Out Form.

**IMPORTANT NOTE:** You will need the following information to retrieve and submit your customized electronic Opt-Out Form:

**Unique E-Ballot ID#:** _

The Solicitation Agent's online portal is the sole manner in which this Opt-Out Form will be accepted via electronic or online transmission. Opt-Out Forms submitted by facsimile, email, or other means of electronic transmission will not be counted. Opt-Out Forms submitted by facsimile, email, or other means of electronic transmission will not be counted. Each Unique E-Ballot # is to be used solely in relation to your Impaired Claim or Interest. Please complete and submit an Opt-Out Form for each Unique E-Ballot ID# you receive, as applicable. If you choose to submit your Opt-Out Form via the Solicitation Agent's online platform, you should not also return a hard copy of your Opt-Out Form.

The Opt-Out Form does not constitute, and shall not be deemed to be, (i) a Proof of Claim or (ii) an assertion or admission of a Claim.

Please note that if you are a Holder of Class 7 (Interests in Surgalign Holdings, Inc.) and hold a position in the security described in the chart below through a nominee at The Depository Trust Company or another similar securities depository, **you may not submit an opt-out election through the "Submit E-Ballot" section of the website and must click on the "Public Equity Opt-Out" link located on the left-hand navigation panel of the Debtors' restructuring website at https://restructuring.ra.kroll.com/surgalign to submit an electronic version of your Opt-Out Form.**

| Class 7 (Interests in Surgalign Holdings, Inc.) | CUSIP/ISIN |
|---|---|
| Common Stock | CUSIP 86882C204 / ISIN US86882C2044 |

The E-Ballot Platform is the sole manner in which this Opt-Out Form will be accepted via electronic or online transmission. Opt-Out Forms submitted by facsimile or email will not be counted.

**THE OPT-OUT DEADLINE IS SEPTEMBER 22, 2023 AT 5:00 P.M. (PREVAILING CENTRAL TIME).**

**THE SOLICITATION AGENT MUST *ACTUALLY RECEIVE* YOUR OPT-OUT ELECTION ON OR BEFORE THE OPT-OUT DEADLINE.**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS OPT-OUT FORM, PLEASE CONTACT SURGALIGNINFO@RA.KROLL.COM (WITH "SURGALIGN SOLICITATION OPT-OUT" IN THE SUBJECT LINE) FOR FURTHER ASSISTANCE.**

Exhibit D

EX-99.1 2 d881181dex991.htm EX-99.1

**Exhibit 99.1**

### RTI Surgical Holdings, Inc.® Receives Notification from Nasdaq Related to Delayed Annual Report on Form 10-K

Deerfield, Ill., March 20, 2020 – As announced on March 16, 2020, RTI Surgical Holdings, Inc. (Nasdaq: RTIX), a global surgical implant company, filed a Notification of Late Filing on Form 12b-25, indicating that the filing of its Annual Report on Form 10-K for the fiscal year ended December 31, 2019 (the "Form 10-K") would be delayed pending completion of an internal investigation of current and prior periods relating to the Company's revenue recognition practices involving the timing of revenue recognition with respect to certain contractual arrangements, primarily with OEM customers, including the accounting treatment, financial reporting and internal controls related to such arrangements.

Subsequent to filing the Form 12b-25, the Company received a letter from The Nasdaq Stock Market LLC ("Nasdaq") indicating that, as a result of the Company's delay in filing its Form 10-K, the Company is not in compliance with the timely filing requirement for continued listing under Nasdaq Listing Rule 5250(c)(1). The notification letter has no immediate effect on the listing or trading of the Company's common stock on the Nasdaq Global Select Market.

Nasdaq indicated that the Company must submit a plan of compliance (the "Plan") within 60 calendar days, or no later than May 18, 2020, addressing how it intends to regain compliance with Nasdaq's listing rules and, if Nasdaq accepts the Plan, it may grant an extension of up to 180 calendar days from the Form 10-K original filing due date, or until September 14, 2020, to regain compliance.

RTI's management is working diligently to complete the Form 10-K, and intends to file the Form 10-K as soon as practicable.

**Media and Investor Contact**

Jonathon Singer
jsinger@rtix.com
+1 630 652 5904

**About RTI Surgical Holdings, Inc.**

RTI Surgical Holdings is a leading global surgical implant company providing surgeons with safe biologic, metal and synthetic implants. Committed to delivering a higher standard, RTI's implants are used in sports medicine, plastic surgery, spine, orthopedic and trauma procedures and are distributed in over 50 countries. RTI has four manufacturing facilities throughout the U.S. and Europe. RTI is accredited in the U.S. by the American Association of Tissue Banks and is a member of AdvaMed. For more information, please visit www.rtix.com. Connect with us on LinkedIn and Twitter.

**Forward-Looking Statements**

This communication contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995, which may include statements regarding RTI Surgical Holdings' ability to file its Form 10-K for the year ended December 31, 2019 within the extension period. These forward-looking statements are based on management's current expectations, estimates and projections about our industry, our management's beliefs and certain assumptions made by our management. Words such as "anticipates," "expects," "intends," "plans," "believes," "seeks," "estimates," variations of such words and similar expressions are intended to identify such forward-looking statements. The forward-looking statements are not guarantees of future performance and are based on certain assumptions including general economic conditions, as well as those within RTI Surgical Holdings' industry, and numerous other factors and risks identified in the Company's Form 10-K for the fiscal year ended December 31, 2018 and other filings with the SEC. Our actual results may differ materially from the anticipated results reflected in these

forward-looking statements. Important factors that could cause actual results to differ materially from the anticipated results reflected in these forward-looking statements include risks and uncertainties relating to the following: (i) uncertainty as to the scope, timing and ultimate findings of the internal investigation; (ii) the costs and expenses relating to the internal investigation; (iii) the impact of the internal investigation on RTI Surgical Holdings, its management and operations, including potential financial impact on RTI Surgical Holdings; (iv) the risk of potential litigation or regulatory action arising from the internal investigation and its findings or from the failure to timely file the Form 10-K; (v) the potential identification of control deficiencies, including potential material weaknesses in internal control over financial report and the impact of the same; (vi) potential reputational damage that RTI Surgical Holdings may suffer as a result of the matters under investigation; (vii) the possibility that RTI Surgical Holdings will be unable to file its Form 10-K within the extension period of 15 calendar days provided under Rule 12b-25 of the Securities Exchange Act of 1934; (viii) the risk that the filing of the Form 10-K will take longer than currently anticipated; (ix) general worldwide economic conditions and related uncertainties; (x) the impact of potential global health emergencies such as COVID-19 (coronavirus); (xi) the effect and timing of changes in laws or in governmental regulations; and (xii) other risks described in our public filings with the SEC. These factors should be considered carefully and undue reliance should not be placed on the forward-looking statements. Each forward-looking statement in this communication speaks only as of the date of the particular statement. Copies of the Company's SEC filings may be obtained by contacting the Company or the SEC or by visiting RTI's website at www.rtix.com or the SEC's website at www.sec.gov. We undertake no obligation to update these forward-looking statements except as may be required by law.

# Exhibit E

EX-99.2 3 d868782dex992.htm EX-99.2

**Exhibit 99.2**

<u>**Employee Communication**</u>

*Intended for email distribution to all RTI Surgical employees immediately following the Form 12b-25 press release.*

Dear Colleagues,

We continue to monitor the progression of COVID-19 (the coronavirus) and its evolving impact on the communities across the world where we operate and serve. We understand there is a significant amount of uncertainty and unpredictability worldwide, particularly as many of our communities are closing schools and universities and cancelling large group gatherings. Our highest priority remains the health and safety of our employees; please continue to take preventive measures and protect your health. Later this week, in lieu of a Town Hall, I'll share a video message to the organization to avoid a large company gathering as a precaution.

Today, RTI announced it will file it will file a Form 12b-25 Notification of Late Filing with the Securities and Exchange Commission (SEC). This provides RTI a 15-calendar day extension within which to file our Form 10-K for the fiscal year ended December 31, 2019.

The delay in filing the Form 10-K is due to an investigation underway by the Audit Committee of RTI's Board of Directors. The Audit Committee initiated an internal investigation regarding RTI's revenue recognition practices related primarily to certain OEM customer contracts. The Audit Committee investigation was precipitated by an ongoing SEC investigation related to the periods 2014 through 2016, when RTI was under previous management.

The Company will not file its Form 10-K until the Audit Committee concludes its investigation and the Company and its independent auditor assess the results of that investigation. Following the filing of our 10-K, we then expect to file the preliminary proxy statement for the special meeting of RTI shareholders to consider and vote on various proposals necessary to close the sale of the OEM business to Montagu. We are making significant progress ensuring both our Spine and OEM businesses are well-positioned for continuity, autonomy and future growth, and we continue to expect the sale to close in the first half of 2020.

This is a unique time for RTI Surgical, and we look forward to overcoming the delays caused by this investigation. These matters should not affect our day-to-day business operations or our commitments to our customers, patients and each other. I am very proud of how far we have come in driving operational excellence, demonstrating teamwork and a growth mindset and building customer centricity. Thank you for your continued focus on delivering high-quality products and services to our customers and patients.

Sincerely,
Camille

**Forward-Looking Statements**

This communication contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995, which may include statements regarding RTI Surgical Holdings' ability to file its Form 10-K for the year ended December 31, 2019 within the extension period and RTI Surgical

Holdings' ability to close the Sale in the first half of 2020. These forward-looking statements are based on management's current expectations, estimates and projections about our industry, our management's beliefs and certain assumptions made by our management. Words such as "anticipates," "expects," "intends," "plans," "believes," "seeks," "estimates," variations of such words and similar expressions are intended to identify such forward-looking statements. The forward-looking statements are not guarantees of future performance and are based on certain assumptions including general economic conditions, as well as those within RTI Surgical Holdings' industry, and numerous other factors and risks identified in the Company's Form 10-K for the fiscal year ended December 31, 2018 and other filings with the SEC. Our actual results may differ materially from the anticipated results reflected in these forward-looking statements. Important factors that could cause actual results to differ materially from the anticipated results reflected in these forward-looking statements include risks and uncertainties relating to the following: (i) uncertainty as to the scope, timing and ultimate findings of the internal investigation; (ii) the costs and expenses relating to the internal investigation; (iii) the impact of the internal investigation on RTI Surgical Holdings, its management and operations, including potential financial impact on RTI Surgical Holdings; (iv) the risk of potential litigation or regulatory action arising from the internal investigation and its findings or from the failure to timely file the Form 10-K; (v) the potential identification of control deficiencies, including potential material weaknesses in internal control over financial report and the impact of the same; (vi) potential reputational damage that RTI Surgical Holdings may suffer as a result of the matters under investigation; (vii) the possibility that RTI Surgical Holdings will be unable to file its Form 10-K within the extension period of 15 calendar days provided under Rule 12b-25 of the Securities Exchange Act of 1934; (viii) the risk that the filing of the Form 10-K will take longer than currently anticipated; (ix) the risk that RTI Surgical Holdings may be unable to obtain shareholder approval for the proposed transaction or that RTI Surgical Holdings or Montagu may be unable to obtain regulatory approvals required for the proposed transaction, or required regulatory approvals may delay the proposed transaction; (x) the risk that a condition to the closing of the proposed transaction may not be satisfied; (xi) the risk that the occurrence of an event that could give rise to termination of the definitive agreement; (xii) the risk that shareholder litigation in connection with the proposed transaction may affect the timing or occurrence of the proposed transaction or result in significant costs of defense, indemnification and liability; (xiii) the timing to consummate the proposed transaction; (xiv) the effect of the announcement or disruption from the proposed transaction making it more difficult to retain and hire key personnel and maintain relationships with customers, suppliers and other third parties; (xv) the diversion of management time and attention on the proposed transaction; (xvi) general worldwide economic conditions and related uncertainties; (xvii) the impact of potential global health emergencies such as COVID-19 (coronavirus); (xviii) the effect and timing of changes in laws or in governmental regulations; and (xix) other risks described in our public filings with the SEC. Additional risks and uncertainties will be discussed in the proxy statement and other materials that RTI Surgical Holdings will file with the SEC in connection with the proposed transaction. There can be no assurance that the proposed transaction will be completed, or if it is completed, that it will close within the anticipated time period or that the expected benefits of the proposed transaction will be realized. These factors should be considered carefully and undue reliance should not be placed on the forward-looking statements. Each forward-looking statement in this communication speaks only as of the date of the particular statement. Copies of the Company's SEC filings may be obtained by contacting the Company or the SEC or by visiting RTI's website at www.rtix.com or the SEC's website at www.sec.gov. We undertake no obligation to update these forward-looking statements except as may be required by law.

**Important Additional Information and Where to Find It**

In connection with the proposed transaction, RTI Surgical Holdings will file relevant materials with the Securities and Exchange Commission, including a preliminary proxy statement on Schedule 14A. Following the filing of the definitive proxy statement with the SEC, the Company will mail the definitive proxy statement and a proxy card to each stockholder entitled to vote at the special meeting related to the proposed transaction. INVESTORS AND SECURITY HOLDERS ARE ENCOURAGED TO READ THE PROXY STATEMENT AND ANY OTHER RELEVANT DOCUMENTS FILED WITH THE SEC WHEN SUCH DOCUMENTS BECOME AVAILABLE, BECAUSE THEY WILL CONTAIN IMPORTANT INFORMATION ABOUT THE PROPOSED TRANSACTION. Investors and security holders will be able to obtain the proxy statement and other relevant materials filed by the Company with the SEC free of charge at the SEC's website, www.sec.gov, from the Company at its website, www.rtix.com, or by contacting the Company's Investor Relations at (847) 530-0249.

**Participants in Solicitation**

The Company and its respective directors and executive officers may be deemed to be participants in the solicitation of proxies in respect of the proposed transaction. Information concerning the Company's participants is set forth in the proxy statement, filed March 25, 2019, for the Company's 2019 annual meeting of stockholders as filed with the SEC on Schedule 14A. Additional information regarding the interests of such participants in the solicitation of proxies in respect of the proposed transaction will be included in the proxy statement and other relevant materials to be filed with the SEC when they become available.

Exhibit F

532 F.Supp.3d 652 (2021)

**Patricia LOWRY, individually and on behalf of all others similarly situated, Plaintiff,**

**v.**

**RTI SURGICAL HOLDINGS, INC., Camille I. Farhat, Brian K. Hutchinson, Jonathon M. Singer, Robert P. Jordheim, and Johannes W. Louw, Defendants.**

<u>Case No. 20 C 1939.</u>

**United States District Court, N.D. Illinois, Eastern Division.**

Signed April 1, 2021.

653   *653 Louis Carey Ludwig, Pomerantz LLP, Chicago, IL, for Plaintiff.

654   *654 Allison Kernisky, Louise McAlpin, Stephen P. Warren, Holland & Knight, LLP, Miami, FL, Martin G. Durkin, Holland & Knight LLC, Chicago, IL, for Defendants RTI Surgical Holdings, Inc., Camille I. Farhat, Jonathon M. Singer.

Stephen J. Crimmins, Murphy & McGonigle PC, Washington, DC, Alan M. Wolper, Ulmer & Berne, LLP, Chicago, IL, James K. Goldfarb, Murphy & McGonigle PC, New York, NY, for Defendant Brian K. Hutchinson.

Deborah Meshulam, Pro Hac Vice, DLA Piper LLP, Washington, DC, Keara M. Gordon, Pro Hac Vice, DLA Piper LLP, New York, NY, Yan Grinblat, DLA Piper LLP, Chicago, IL, for Defendant Robert P. Jordheim.

Adam Louis Schwartz, Pro Hac Vice, Russell Koonin, Esq., Pro Hac Vice, Homer Bonner Jacobs Ortiz, P.A., Miami, FL, Elizabeth Ann Austermuehle, Vivek Jayaram, Jayaram Law Group, Ltd., Chicago, IL, for Defendant Johannes W. Louw.

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Patricia Lowry filed this suit against RTI Surgical Holdings, Inc. (RTI) and five of its current and former officers—Camille Farhat, Jonathon Singer, Brian Hutchinson, Robert Jordheim, and Johannes Louw (collectively, the individual defendants)—on behalf of a class of individuals who acquired RTI common stock between March 7, 2016 and March 27, 2020 (the class period). Rosy Yeretsian, who has been appointed as the lead plaintiff, asserts that the defendants engaged in improper "revenue smoothing"—a practice of shipping products to customers early to hit quarterly revenue targets, in violation of RTI's internal policy and without customer authorization. The SEC and the company's internal audit committee investigated RTI for its questionable accounting practices, and RTI subsequently announced that it would restate five consecutive years of SEC filings. As a result, RTI's share price dropped; it lost one-fourth of its market value as a company, causing stockholders significant economic loss.

Yeretsian alleges that the defendants' improper revenue recognition practice during the class period violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and SEC Rule 10b-5. The defendants have moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, the Court denies the defendants' motions to dismiss.

## Background

RTI is a surgical implant company based in Deerfield, Illinois. It designs, develops, manufactures, and distributes surgical implants worldwide. On a quarterly basis and at the end of each fiscal year, RTI's management—including the individual defendants—updates investors and analysts on the company's performance. Also, the SEC requires companies like RTI to submit financial reports on a quarterly basis (Forms 8-K and 10-Q) and for each fiscal year (Form 10-K). RTI routinely files these forms with the SEC.

Before and during the class period, RTI had four lines of business—spine, sports, original equipment manufacturer (OEM), and international. OEM accounted for the largest portion of its business, and during the class period, RTI represented that OEM was its most profitable business segment. Yeretsian asserts that as early as 2014—unbeknownst to RTI investors—

655    RTI was improperly recognizing revenue and reporting false information about the *655 performance of its OEM business to the SEC, investors, and analysts.

The individual defendants in this case are current and former RTI officers. Yeretsian alleges that each of them directly participated in RTI's management, oversaw day-to-day operations at the highest levels, and were privy to confidential information regarding business performance. Defendant Camille Farhat has served as RTI's CEO since March 2017. His predecessor, defendant Brian Hutchinson, was RTI's CEO from December 2001 to December 2016. Defendant Jonathon Singer has served as CFO and administrator since September 2017. His predecessor, defendant Robert Jordheim, served as RTI's executive vice president and CFO from July 2013 until September 2017, and as interim CEO from December 2016 to March 2017. Defendant Johannes Louw served as RTI's vice president of financial planning and analysis from September 2018 until he was terminated in April 2020. Defendant Louw had a brief stint as CFO in January 2020; at that time, Singer, who was CFO, was promoted to the role of COO.

## A. RTI's revenue recognition practice

Yeretsian's securities fraud claims are based in part on statements from confidential witnesses, three of whom are former RTI employees and one of whom was employed by a key RTI customer, Medtronic, from 2006 to 2015. Yeretsian alleges that during the class period, RTI's management, including some of the individual defendants, directed account managers (employees who coordinate product orders and shipments with RTI customers) to ask customers to accept early shipments so that RTI could hit its monthly and quarterly revenue targets. She asserts that RTI's management also directed account managers to ship products early even without the customer's authorization. By these practices, Yeretsian contends, RTI misleadingly portrayed potential future sales as current sales.

For instance, Yeretsian's first confidential witness, Former Employee 1 (FE1), a director of corporate accounts at RTI just before the class period, stated that "on orders from top executives, RTI ... regularly asked its largest customer, Medtronic, to accept shipment of orders earlier than planned so that the order would come in before the end of a quarter." Am. Compl. ¶¶ 67-68 (dkt. no. 53). At one point, FE1 was instructed to ask Medtronic to ship a $2-3 million order early, but when Medtronic refused, RTI "shipped the order early anyway." Id. ¶ 69. Former Employee 2 (FE2), a senior executive assistant to an RTI executive vice president, stated that they sat in on a meeting involving defendant Louw, where "the practice of early shipping to RTI customers" was discussed. Id. ¶ 73.

Another confidential witness, Former Employee 3 (FE3), who worked at RTI from 2002 to 2017 stated that "it was commonplace for RTI to ship orders early to [OEM] customers so the Company could meet monthly and quarterly revenue targets." Id. ¶¶ 75-79, 83. This witness reported to defendant Hutchinson. In another instance, defendant Jordheim told an RTI employee that "RTI needed to book additional revenue before the end of the quarter and that the Company would be shipping a purchase order early to one of [the]... product distributors." Id. ¶ 86.

Yeretsian's final confidential witness, Former Employee 4 (FE4), was a Medtronic employee from 2006 to 2015 and dealt directly with RTI. FE4 "attest[s]" to RTI's "practice of shipping products in months other than the months those products

656    were due to arrive," and in some cases, RTI "shipped products early to *656 Medtronic without first obtaining permission to do so." Id. ¶¶ 88-90.

## B. RTI's financial reporting during the class period

At the start of the class period, on March 7, 2016, RTI filed a Form 10-K for the fiscal year ending on December 31, 2015 with the SEC; defendant Hutchinson (then CEO) and defendant Jordheim (then executive vice president and CFO) signed the form. In relevant part, RTI's 2015 10-K stated that "Revenue is recognized upon shipping, or receipt by the Company's customers of the implant, depending on the Company's distribution agreements with the Company's customers or distributors. Other revenues are recognized when all significant contractual obligations have been satisfied." Id. ¶ 93. The 2015 10-K further stated that RTI's annual revenue had increased $19.5 million compared to the prior fiscal year (ending on December 31, 2014). The 10-K also stated that "[o]ur year over year revenue comparisons were impacted due to a

significant amount of our revenue being derived from large commercial stocking distributors, whose timing of orders can vary from year to year." *Id.* ¶ 95. Finally, RTI represented in the 2015 10-K that its "internal control over financial reporting is effective." *Id.* ¶ 96. Yeretsian asserts that all of these statements were false and misleading because RTI's revenue recognition practice was improper and its internal controls were actually ineffective.

On April 28, 2016, RTI announced Q1 2016 financial results in a Form 8-K with the SEC. The form reflected an increase of 18 percent in international revenue compared to Q1 2015. That same day, RTI leaders—defendants Jordheim and Hutchinson—held a conference call with investors and analysts. During the call, defendant Hutchinson "we've seen revenue from our commercial [OEM] business ebb and flow from year-to-year, but trending to growth long-term." *Id.* ¶ 103. They also stated that the OEM business "has achieved compound average annual growth rate of 7%." *Id.* RTI filed its Q1 2016 report on Form 10-Q; it was signed by defendants Hutchinson and Jordheim and stated that they "concluded that the design and operation of our disclosure controls and procedures were effective as of the end of the period covered by this report." *Id.* ¶ 108. Yeretsian contends that all of these statements were materially false and misleading.

Yeretsian's remaining allegations of RTI's false statements concern similar communications made to external stakeholders and in SEC forms submitted between 2016 and 2019: RTI's quarterly and annual SEC filings (Form 8-K, Form 10-Q, and Form 10-K) and RTI management's communications to investors and analysts on quarterly earnings calls. Each filing with the SEC was signed by RTI's CEO and CFO. As explained previously, each individual defendant served as CEO or CFO at some point during or after the class period. Each of them have signed at least one SEC filing reflecting RTI's financial results within the class period. Yeretsian also alleges that on quarterly earnings calls with investors and analysts, every individual defendant, at some point between 2016 and 2019, either made false statements about RTI's performance or misrepresented the effectiveness of the company's internal controls. Yeretsian contends that the defendants' alleged misrepresentations concerned RTI's "most critical segment": the OEM business. Am. Compl. ¶¶ 3, 50.

## C. RTI prepares to sell OEM business

657    On January 10, 2020, RTI promoted defendant Singer to COO and promoted *657 Louw to CFO, contingent and effective upon RTI's proposed sale of its most profitable segment—the OEM business—which RTI reported had record results in Q2 2019. On January 13, 2020, RTI announced that it reached an agreement to sell its OEM business to a private equity firm. Upon the announcement of the deal, RTI shares jumped over 63 percent.

## D. RTI announces investigation into revenue recognition practices and related disclosures

On March 16, 2020, RTI issued a press release announcing that it could not file SEC Form 10-K for the fiscal year ending on December 31, 2019 because RTI's internal audit committee was investigating the company's revenue recognition practices. The press release stated, in relevant part:

> The Audit Committee ... of the Company's Board of Directors, with the assistance of independent legal and forensic account advisors, is in the process of conducting an internal investigation of current and prior period matters relating to the Company's revenue recognition practices regarding the timing of revenue with respect to certain contractual arrangements, primarily with OEM customers, including the accounting treatment, financial reporting and internal controls related to such arrangements.

Am. Compl. ¶ 217. The press release also stated that the internal investigation "was precipitated by an ongoing SEC investigation related to the periods 2014 through 2016." *Id.* ¶ 218. Two days after the issuance of the press release, the per-share price of RTI stock dropped by approximately 27.6 percent. Yeretsian alleges that less than three weeks before the March 16, 2020 disclosure, defendant Singer sold 11,450 shares, for a gain of approximately $44,444. Yeretsian further asserts that RTI's previous financial statements violated generally accepted accounting principles (GAAP). *See id.* ¶¶ 54-58.

On March 20, 2020, RTI filed with the SEC a report on a Form 8-K, in which it stated that it was not in compliance with the timely filing requirement under the Nasdaq exchange's listing rules. In that same report, RTI announced that defendant Louw, who had recently been promoted to CFO, would no longer be employed at RTI as of April 8, 2020. The next trading day, the price of RTI's shares fell again, by 19.6 percent.

On March 30, 2020, RTI announced that it had received a letter stating that it had breached the purchase agreement for the OEM sale by failing to file a proxy statement with the SEC. In that same report, RTI announced that it was postponing both its annual shareholder meeting and a special shareholder meeting; the latter meeting had been set for shareholders to vote on various proposals necessary to close the OEM business sale. That day, the price of RTI's shares fell 11 percent.

On April 9, 2020, in an SEC Form 8-K filing, RTI disclosed that the internal audit committee concluded that the company had to restate the following financial statements to the SEC, which RTI had previously issued: annual statements for 2014, 2015, 2016, 2017, and 2018, as well as quarterly statements for 2016, 2017, 2018, and the first three quarters of 2019. Further, RTI stated that

> investors should no longer rely upon the Company's previously released financial statements as of and for the years ended December 31, 2018, 2017, 2016, 2015, and 2014, and the reports on the financial statements and internal control over financial reporting of the Company's independent registered public accounting firm thereon; or the quarterly financial *658 statements and other financial data released related to the Relevant Periods.

658

> The Company has concluded that the revenue of certain invoices should have been recognized at a later date than when originally recognized. In response to binding purchase orders from certain OEM customers, goods were shipped and received before requested delivery dates and agreed-upon delivery windows. In many instances, the OEM customers requested or approved the early shipments, but the Company has determined that on other occasions, the goods were delivered early without obtaining the customers' affirmative approval.

Am. Compl. ¶ 225. RTI also stated that it would "revise its financial statements to correct these errors and any others as it finalizes the Investigation." *Id.*

On June 8, 2020, RTI filed an amended Form 10-K for 2018, in which it stated that revenue should have been recognized at a later date, it had delivered goods without customer approval, and "[s]ome of those unapproved shipments were shipped by employees in order to generate additional revenue and resulted in shipments being pulled from a future quarter into an earlier quarter." *Id.* ¶ 226. RTI's amended Form 10-K also included statements concerning "certain material weaknesses" in RTI's "disclosure controls and procedures." *Id.* ¶ 229. RTI also stated that "[w]e did not maintain an effective control environment" and that "[t]he tone from executive management was insufficient to create the proper environment for effective internal control over financial reporting." *Id.* That same day, RTI filed Form 10-K for 2019, in which it referenced these same errors regarding OEM business revenue. On June 29, 2020, RTI filed a Q1 2020 report with the SEC, in which it reported the same revenue recognition errors.

On March 23, 2020, plaintiff Lowry filed a complaint against RTI and senior management personnel alleging violations of federal securities laws. Several other similar lawsuits followed. On August 31, 2020, after her appointment as lead plaintiff, Yeretsian filed a consolidated amended complaint. In count 1, Yeretsian alleges that the defendants violated section 10(b) of the Securities Exchange Act and SEC Rule 10b-5. Specifically, she alleges that the misstatements RTI made during the class period—primarily concerning its OEM business—and later disclosed as erroneous were material. Further, she contends these statements were made by RTI and the individual defendants with scienter: intentionally, knowingly, or, at minimum, with deliberate recklessness. Yeretsian alleges that these actions caused her and the class members economic loss because the price of RTI common stock they purchased was artificially inflated, and its value declined significantly when RTI made its corrective disclosures. Accordingly, Yeretsian and the other members of the class assert that that the defendants are liable to the putative class for damages.

In count 2 of the amended complaint, Yeretsian alleges—based on the same factual allegations—that each of the individual defendants, as RTI corporate officers in positions of control and authority during the class period, are liable under section 20(a) of the Securities Exchange Act on the ground that they were "controlling persons" of RTI within the meaning of the Act.

## Discussion

The defendants have moved to dismiss Yeretsian's claims under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim and for failure to plead fraud with particularity under Rule 9(b) and the Private Securities Litigation Reform Act of

659  1995 (PSLRA), 15 U.S.C. § 78u-4(b)(1). In *659 deciding a motion to dismiss for failure to state a claim, the Court must accept as true all well-pleaded factual allegations in the complaint and must draw all reasonable inferences in the plaintiff's favor. *NewSpin Sports, LLC v. Arrow Elecs., Inc.*, 910 F.3d 293, 299 (7th Cir. 2019). To survive a motion to dismiss for failure to state a claim, the plaintiff must allege facts sufficient for a court to draw a plausible inference that the defendant is liable for the alleged misconduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

Both of Yeretsian's claims against the defendants are based on fraud and are therefore subject to heightened pleading standards. Rule 9(b) requires a plaintiff to allege "with particularity" the circumstances that constitute fraud, which is the "who, what, when, where, and how" of the deceptive conduct. *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016). This standard requires a plaintiff to allege fraud with precision and "some measure of substantiation." *Id.* (internal quotations omitted). Yeretsian's section 10(b) claim must also meet the more stringent standard set forth in the PSLRA, which requires a plaintiff to plead with particularity:

> each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and the basis for the belief that the defendants' statements were misleading and, if an allegation regarding the statement or omission is based on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1)(B); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 594 (7th Cir. 2006), *vacated and remanded on other grounds*, 551 U.S. 308, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). And unlike Rule 9(b), the PSLRA also requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." 15 U.S.C. § 78u-4(b)(2)(A).

The defendants argue that Yeretsian has failed to allege facts sufficient under these standards to support any of their fraud claims. The elements of a claim under section 10(b) and SEC Rule 10b-5 are: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) justifiable reliance by the plaintiff; (5) economic loss; and (6) loss causation. *Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 936 (7th Cir. 2018) (quoting *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008)). Specifically, the defendants contend that Yeretsian has not adequately alleged two elements of her securities fraud claim: material misrepresentation and scienter. The individual defendants have also moved to dismiss Yeretsian's section 20(a) claim. They contend that because there is no primary violation under section 10(b) of the Securities Exchange Act, there can be no control person liability under section 20(a). *See Pugh*, 521 F.3d at 693.

## A. Section 10(b) claim

## 1. Material misstatements

"To satisfy the material misrepresentation element of a § 10(b) claim, a plaintiff must allege that the defendant made a statement that was 'misleading as to a material fact.'" *In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 814 (N.D. Ill. 2017)
660 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238, 108 S.Ct. 978, 99 L.Ed.2d *660 194 (1988)). "A misrepresentation is material if a reasonable investor would view it as significantly alter[ing] the total mix of information available and important to deciding whether to buy or sell a security." *Twin Master Fund, Ltd. v. Akorn, Inc.*, No. 19 C 3648, 2020 WL 564222, at *5 (N.D. Ill. Feb. 5, 2020) (Kennelly, J) (citing *Appert v. Morgan Stanley Dean Witter, Inc.*, 673 F.3d 609, 616 (7th Cir. 2012)).

The defendants contend that Yeretsian has not adequately alleged material misstatements. They argue that the original reports were not materially false because the restatement increased RTI's reported revenue for certain financial periods and otherwise had an "insignificant overall quantitative effect on the Company's key metrics." RTI's Mem. in Support of Mot. to Dismiss at 25 n.56 (dkt. no. 60); Hutchinson's Mem. in Support of Mot. to Dismiss at 8-9 (dkt. no. 67). Defendants also contend that Yeretsian's allegations lack "specificity" about "how any particular early shipment, in any particular quarter, rendered a particular revenue figure false." Jordheim's Mem. in Support of Mot. to Dismiss at 8 (dkt. no. 63); *see also* RTI Mem. in Support of Mot. to Dismiss at 9-11. The defendants also assert that revenue smoothing is not necessarily deceptive because a customer could return products that RTI shipped early. Hutchinson's Mem. at 5-6. Finally, the defendants contend that the Court should "discount" Yeretsian's allegations because they "rest[] exclusively on conclusory allegations" from confidential witnesses. RTI's Mem. at 10.

The Court concludes Yeretsian has adequately alleged that the defendants made material misstatements. She alleges that RTI and its management reported inaccurate financial results to the SEC for at least five consecutive years; RTI's filings violated GAAP requirements; RTI was subject to an investigation by the SEC as well as an internal audit committee for its erroneous revenue recognition practices in the OEM business and ineffective internal controls; RTI's improper activities led it to resubmit five years' worth of financial reports. A company's restatement of previously reported financial results is likely enough by itself to show materiality. The reason for this is that under GAAP, previously-issued financial statements should be restated only to correct material accounting errors. *See Akorn*, 240 F. Supp. 3d at 816 (citing *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 437 (S.D.N.Y. 2005)); *Roth v. OfficeMax, Inc.*, No. 05 C 236, 2006 WL 2661009, at *4 (N.D. Ill. Sept. 13, 2006) ("Plaintiffs have adequately alleged that [the company's] statements [regarding its financial results] were false or misleading because the Company restated its financial results....").

In addition, the fact that RTI's stock price dropped by a significant amount within one trading day of corrective disclosures tends to "confirm[] that [its] misstatements were material." *Akorn*, 240 F. Supp. 3d at 816; *see also Ross v. Career Educ. Corp.*, No. 12 C 276, 2012 WL 5363431, at *6 (N.D. Ill. Oct. 30, 2012) (concluding that "[t]he market's negative reaction further tends to show that defendants' alleged misstatements were material") (Kennelly, J.); *Anderson v. Abbott Labs.*, 140 F. Supp. 2d 894, 902 (N.D. Ill. 2001) (observing that even "a little" reaction from the market may indicate materiality). Taken together, Yeretsian's allegations plausibly indicate "a substantial likelihood" that RTI's disclosures were "viewed by the reasonable investor as having significantly altered the total mix of information made available." *Matrixx Initiatives; Inc. v. Siracusano*, 563 U.S. 27, 38, 131 S.Ct. 1309, 179 L.Ed.2d 398 (2011) (discussing the materiality requirement) (internal quotation marks omitted). At the pleading stage, *661 Yeretsian's allegations are sufficient; the defendants' alleged misstatements about RTI's financial results between 2015 and 2019—in SEC filings of Form 8-K, Form 10-K, and Form 10-Q, as well as quarterly earnings calls—"qualify as material misrepresentations." *Id.*

## 2. Scienter

The defendants also argue that Yeretsian has not adequately alleged that each of them had the requisite mental state. For a section 10(b) claim, scienter is "knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Pugh*, 521 F.3d at 693; *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 704-05 (7th Cir. 2008) ("*Tellabs III*"). Under the PSLRA's stringent pleading standard, the plaintiff's allegations must support "a strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2)(A). In the Seventh Circuit, "[p]leading a `collective scienter' for a group of defendants does not meet the PSLRA's particularity standard, and a plaintiff must plead a defendant's scienter as to each statement or omission underly a section 10(b) claim.'" *Twin Master Fund, Ltd.*, 2020 WL 564222, at *13 (quoting *Cornielsen v. Infinium Capital Mgmt., LLC*, 916 F.3d 589, 600 (7th Cir. 2019)).

Yeretsian advances several arguments in support of her contention that she has adequately alleged facts giving rise to a strong inference of the defendants' scienter. Pl.'s Resp. Mem. at 23-40. Her factual allegations indicate that it was RTI's management—including each of the individual defendants—who, as corporate officers, "acted, at a minimum, recklessly" when they repeatedly asserted in SEC filings and on earnings calls between 2015 and 2019 that RTI's internal controls were effective during the class period, yet admitted in corrective disclosures issued in 2020 that these same controls were ineffective. *Id.* at 24. Yeretsian further contends that the "magnitude" and "sheer number of inaccurate financial reports filed by RTI"—five years' of inaccurate reporting to the SEC, investors, and analysts—"is a robust indicator" of the defendants' recklessness. *Id.* at 27-28. Moreover, RTI openly admitted in corrective disclosures that it violated its own revenue recognition practice by shipping goods to customers early without their authorization. *Id.* at 29. Yeretsian also relies on plausibly reliable statements from confidential witnesses, including three former employees, each of whom appear to have personal knowledge of (1) it being "commonplace for RTI [to] ship orders early ... so the Company could meet monthly and quarterly revenue targets" and (2) management's awareness, and perhaps encouragement, of "improper practices that led to the massive Restatement." *Id.* at 31.

In reviewing the amended complaint, the Court finds that Yeretsian has included specific factual allegations plausibly implicating RTI's management—namely the individual defendants—as the key personnel responsible for designing and maintaining RTI's internal controls; these same individuals later acknowledged RTI's internal control deficiencies. Am. Compl. ¶ 247. Yeretsian has also alleged specific facts plausibly indicating that at least some of the individual defendants directed account managers to ship products early (or were aware of and condoned this practice) and that each defendant signed SEC filings attesting to the accuracy of RTI's financial reports even though those reports were erroneous. *See* Am.

Compl. ¶ 86 ("Jordheim told ... RTI needed to book additional revenue before the end of the quarter"), ¶ 73 (Louw attended
meeting where "practice of early shipping to RTI customers" was discussed), ¶ 75 (confidential *662 witness who reported
to Hutchinson and managed revenue confirmed that "it was commonplace for RTI to ship orders early to customers so the
Company could meet monthly and quarterly revenue targets").

In response, the defendants urge this Court to dismiss the section 10(b) claim on the ground that Yeretsian's factual
allegations do not sufficiently indicate scienter. For instance, RTI contends that Yeretsian has not alleged "a cogent motive"
for fraud. RTI's Mem. at 13-15. In particular, RTI and the individual defendants suggest that if the individual defendants
wanted to commit fraud, they would have sold their RTI stock at "supposedly artificially inflated prices." Id.

Next, RTI argues that the Court should disregard the confidential witnesses' statements because they do not "set forth
individualized allegations as to the purported state of mind of each Defendant." Id. at 17 & n.35. The defendants challenge
reliance on confidential witnesses because some were not employed during the class period or are otherwise unreliable.
RTI's Mem. at 17. RTI also asserts that "[t]he fact that RTI restated its financial statements and had to improve its internal
controls does not, without more, support an inference... [of] scienter." Id. at 19. Finally, RTI contends that the factual
allegations support a more compelling "non-culpable inference": "negligent oversight of overzealous accounting" or some
other "breakdown lower in the corporate hierarchy." Id. at 23-24 (quoting Kohl's Corp., 895 F.3d at 939, 941). The individual
defendants offer similar arguments to support the contention that Yeretsian's factual allegations are insufficient to show
scienter. See, e.g., Hutchinson's Mem. at 10-11 (arguing that the scienter allegations lack specificity, are conclusory, and
improperly rely on confidential witnesses); Jordheim's Mem. at 11-14; Louw's Mem. in Support of Mot. to Dismiss at 9-14
(dkt. no. 61).

The defendants' arguments are unsupported by the law and misconstrue Yeretsian's contentions. Her allegations are
sufficient to give rise to a compelling inference of scienter regarding each individual defendant. First, as Yeretsian argues,
she is not required to plead facts regarding the defendants' motive to commit fraud to establish scienter; a plaintiff need only
plead facts indicating an "intent to deceive or reckless disregard for the truth." Costello v. Grundon, 651 F.3d 614, 634 (7th
Cir. 2011); Pl.'s Resp. Mem. at 37. Second, as Yeretsian points out, RTI's "clean audit" from an external accounting firm
does not negate her factual allegations of scienter. Pl.'s Resp. Mem. at 30. Also, Yeretsian has alleged facts plausibly
indicating that each of the individual defendants— all of whom served as RTI's CEO, CFO, or other high-level roles during
the class period—was responsible for designing and supervising RTI's internal controls over financial reporting. See Akorn,
240 F. Supp. 2d at 819.

For these reasons, the defendants' argument that Yeretsian's allegations improperly rely on group pleading, see Cornielsen,
916 F.3d at 600, lacks merit. The Seventh Circuit's analysis in Tellabs III is instructive: "it is possible to draw a strong
inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud."
Tellabs III, 513 F.3d at 710. In this case, Yeretsian has not alleged that RTI's "management" or "each corporate officer"
should be liable for securities fraud based merely on "group-published documents" like "annual reports and press releases."
See id. Rather, Yeretsian has pleaded several facts indicating that each individual defendant repeatedly mischaracterized
RTI's OEM business revenue to the SEC, investors, and analysts, condoned business *663 practices that violated internal
RTI policies, and directed individual employees and customers to engage in business activities in order to smooth RTI's
revenue on a monthly and quarterly basis. Moreover, RTI admitted that the "tone from executive management" specifically
prevented the company from exercising effective internal controls. Am. Compl. ¶ 229.

Further, statements from Yeretsian's confidential witnesses—former employees whose work responsibilities made them
aware of RTI's deficient internal controls —include facts plausibly indicating that it was "commonplace" for RTI to flout its
own revenue recognition policies during the class period and leading up to it. See id.; Pl.'s Resp. Mem. at 31; see Van
Noppen, 136 F. Supp. 3d at 934-35 (if the plaintiff "describe[s] the witnesses with enough detail," the "Court can determine
that the confidential witnesses have a foundation for their allegations").

In Tellabs III, the Seventh Circuit suggested that it is appropriate for courts to rely on statements from "confidential sources"
who "consist of persons who from the description of their jobs [are] in a position to know at first hand the facts to which they
are prepared to testify." Tellabs III, 513 F.3d at 712. In this case, Yeretsian's confidential witnesses—three former RTI
employees and one RTI customer —each provide detailed, firsthand accounts of RTI's improper practices.

In addition, "the nature and extent of Defendants' misrepresentations" regarding RTI's performance and internal controls
makes "the inference of scienter even more reasonable." See Akorn, 240 F. Supp. 3d at 820. Each individual defendant in

this case was in a leadership position that made him privy to RTI's operations at the highest levels and accountable for RTI's internal business practices, especially with regard to its most important business segment that RTI, at a certain point, was preparing to sell. *See* *Jones v. Corus Bankshares, Inc.*, 701 F. Supp. 2d 1014, 1029 (N.D. Ill. 2010) ("[W]hile a court cannot presume scienter, a strong inference of scienter may still be credited where it is almost inconceivable that an individual defendant would be unaware of the matters at issue."). Moreover, each individual defendant signed his name on SEC filings— including Form 8-K, Form 10-Q, Form 10-K —containing misleading information about RTI's revenue. *See* *Twin Master Fund, Ltd.*, 2020 WL 564222, at *13-14 (concluding that "[t]he plaintiffs' allegations are ... sufficient" in part because they are based on "allegedly fraudulent" information in "Forms 8-K and 10-Q" that that the defendant signed); *see also* *SEC v. Sys. Software Assocs., Inc.*, 145 F. Supp. 2d 954, 958 (N.D. Ill. 2001) (concluding that the SEC sufficiently alleged securities fraud against corporate officers based on inaccurate financial statements that they each signed).

The fact that each defendant attested to the accuracy of information in quarterly and annual SEC filings yet failed to even once detect a risk of erroneous financial reporting during the class period is more than sufficient at the pleading stage to indicate recklessness. *SEC v. Fisher*, No. 07 C 4483, 2012 WL 3757375, at *13 (N.D. Ill. Aug. 28, 2012) ("[I]t is long settled that a magnitude of reporting errors lend weight to allegations of recklessness where defendants were in a position to detect the errors."). Finally, the fact that the SEC and RTI's internal audit committee initiated an investigation into RTI's revenue recognition practices and internal controls "provides additional support for finding that scienter has been adequately pleaded." *See* *Akorn*, 240 F. Supp. 3d at 820.

664   On these facts, "a reasonable person would deem the inference of scienter cogent *664 and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) ("*Tellabs II*"). Thus Yeretsian's allegations of the defendants' scienter satisfy the PSLRA's heightened pleading standard for the section 10(b) claim.

## B. Section 20(a) claim

In count 2, Yeretsian alleges that the individual defendants—each of whom "participated in the operation and management of RTI"—knew, "[b]ecause of their senior positions," the "adverse non-public information about RTI's current financial position and future business prospects." Am. Compl. ¶ 279. Further, Yeretsian asserts that they each "acted as a controlling person of RTI," "had the power to direct the actions of [RTI]" and caused the company "to engage in the unlawful acts and conduct" described earlier in the complaint. *Id.* ¶ 282. Accordingly, Yeretsian contends, the individual defendants, each of whom was a "control person" of RTI during the class period, are liable under section 20(a) of the Securities Exchange Act. *Id.* ¶ 283.

The defendants do not present any meaningful argument to defeat Yeretsian's argument in support of control person liability under section 20(a) of the Securities Exchange Act. *See, e.g.*, RTI's Mem. at 25 (one-sentence argument to dismiss section 20(a) claim); Hutchinson's Mem. at 15 ("The complaint does not state a primary securities violation for the time when Mr. Hutchinson could have been a control person...."); Jordheim's Mem. at 15 ("Because the AC has not alleged any primary violation, the control person claim against Mr. Jordheim also should be dismissed."); Louw's Mem. at 15 n.5 (relegating argument requesting dismissal of section 20(a) claim to a footnote). In their opening briefs and reply briefs, the defendants summarily reject Yeretsian's contention that they are liable under section 20(a) on the basis that she failed to allege a plausible section 10(b) claim. But the Court has determined that Yeretsian *has* adequately alleged a section 10(b) claim and therefore survives the motions to dismiss. No defendant has advanced any other argument in support of dismissing count 2. The Court therefore denies all of their motions to dismiss the section 20(a) claim.

## Conclusion

For the foregoing reasons, the Court denies the motions to dismiss submitted collectively by defendants RTI, Farhat, and Singer [dkt. no. 59], defendant Hutchinson's motion to dismiss [dkt. no. 65], defendant Jordheim's motion to dismiss [dkt. no. 62], and defendant Louw's [dkt. no. 61] motion to dismiss. The defendants are directed to answer the amended complaint by no later than April 29, 2021. The parties are also directed to confer regarding a discovery and pretrial schedule to propose to the Court and are to submit a joint status report containing an agreed or separate proposals by no later than April 22, 2021. The Court also assumes that it may dismiss the related cases (Case Nos. 20 C 3464, 20 C 3347, and 20 C 3953) and directs the parties to address this point in the status report as well. The case is set for a telephonic status hearing

on May 3, 2021 at 8:40 a.m., using call-in number 888-684-8852, access code 746-1053. Counsel should wait for the case
to be called before announcing themselves.

Save trees - read court opinions online on Google Scholar.

Exhibit G

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## CENTRAL DISTRICT
## LEXINGTON

**CRIMINAL ACTION NO: 5:21-CR-00110-KKC**

**UNITED STATES OF AMERICA**                                      **PLAINTIFF**

**V.**                           **SENTENCING MEMORANDUM**
                              **OF THE UNITED STATES**

**DOUGLAS HAWKINS**                                              **DEFENDANT**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

Defendant Hawkins was found guilty, after a jury trial, of one count of investment

advisor fraud (15 U.S.C. §§ 80b-6 and 18b-17), one count of securities fraud (15 U.S.C.

§§ 78j(b) and 78ff) and two counts of mail fraud (18 U.S.C. § 1341). For the reasons set

forth below, the United States respectfully submits that a term of imprisonment within the

United States Sentencing Guidelines (U.S.S.G.) and 18 U.S.C. § 3553(a), as well as

restitution, is an appropriate sentence.

### I.    THE APPLICABLE ADVISORY GUIDELINE RANGE

The advisory Sentencing Guideline range serves as the "starting point and initial

benchmark" for the Court's sentencing analysis. *United States v. Bolds*, 511 F.3d 568,

579-80 (6th Cir. 2007) (citation omitted). Thus, the Court "should begin all sentencing

proceedings by correctly calculating the applicable Guidelines range." *United States v.*

*King*, 553 Fed. Appx. 518, 520 (6th Cir. 2014) (citing *Gall v. United States*, 552 U.S. 38, 49 (2007)).

The Presentence Investigation Report (hereafter "PSR") accurately determines Hawkins's total offense level to be 33: the base offense level is 7 pursuant to U.S.S.G. § 2B1.1(a)(1); the offense level is increased by 16 pursuant to U.S.S.G. § 2B1.1(b)(1)(I) because the fraud totaled more than $1,500,000 but less than $3,500,000; the offense level was increased by 2 pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i) because the offense involved 10 or more victims; the offense level was increased by 2 pursuant to U.S.S.G. § 2B1.1(b)(10)(C) because the offense involved sophisticated means; the offense level was increased by 4 pursuant to U.S.S.G. § 2B1.1(b)(20)(A)(iii) because the defendant was an investment advisor; and the offense level was increased by 2 pursuant to U.S.S.G. § 3C1.1 because Hawkins obstructed justice. [PSR ¶¶ 27-38.] Given the offense level of 33 and Hawkins's criminal history category of I, his advisory Guideline range is imprisonment for 135 to 168 months. [PSR ¶ 77.]

## II.    APPLICATION OF 18 U.S.C. § 3553(a)

While the advisory Sentencing Guideline range serves "as the starting point and initial benchmark" for the Court's sentencing analysis, *Bolds*, 511 F.3d 579-80, the Court must also consider the other factors set forth in 18 U.S.C. § 3553(a). The factors include the nature and circumstance of the offense, the history and characteristics of the defendant, the need for the sentence imposed to reflect the seriousness of the offense and to afford adequate deterrence, to protect the public and provide the defendant with needed educational training or medical care, the kinds of sentences available, the need to avoid

2

unwarranted sentencing disparities between similarly-situated defendants, and the need to provide restitution to the victims. When determining the appropriate sentence to be imposed, the Court seeks to find a punishment that is "sufficient, but not greater than necessary". 18 U.S.C. § 3553(a). Balancing all the relevant factors, the United States submits the appropriate sentence for this defendant is a sentence of imprisonment within the guideline range and restitution.

The nature and circumstances of the offense reveal a serious crime resulting from a brazen breach of trust by a man who was concerned not for his clients, but for his own reputation. The majority of Hawkins's clients were reaching retirement age, between 55 and 75 years old. [R. 57, Trial Tr. Jan. 31, 2023, Page ID 688.] The clients hired Hawkins, an investment advisor, because they needed professional advice on managing their investments to help secure their future.

The relationship between the defendant and his clients was a position of trust wherein the clients should have been able to rely on Hawkins, their investment advisor, to look out for their best interest. [*See* R. 57, Trial Tr. Jan. 31, 2023, Page ID 627.] Hawkins used his position as an attorney, investment advisor, and preacher to gain the trust of his clients. William Peterson testified that he trusted the defendant, who was a lawyer, minister, and certified financial planner. [R. 56, Trial Tr. Jan. 30, 2023, Page ID 436.] Donna Marsh testified that she knew the defendant was an investment advisor and a preacher at her church, therefore, she trusted, and respected, him. S [R. 57, Trial Tr. 57, Jan. 31, 2023, Page ID 582-583; Government Exhibit 5.] Allen Waugh testified that he

3

trusted the defendant because he was an investment advisor. [R. 60, Trial Tr. Feb. 2, 2023, Page ID 945.]

J.R. spent a considerable amount of time with the defendant and came to a "level of trust". [Government Exhibit 10.] M.S. and G.M. wrote, "We entrusted our life savings to them with the belief that they were what they professed to be, fiduciaries and Christians." [Government Exhibit 19.] P.P. believed that Hawkins "was a kind, religious, caring and qualified advisor" and that she trusted he had her best interests at heart. [Government Exhibit 21.]

But, as the evidence at trial revealed, the defendant took advantage of that trust and betrayed his clients. J.L. a grieving widow, felt she was taken advantage of by the defendant. [Government Exhibit 2.] D.M. testified at trial to "try and stop him from doing it to any other person, especially another widow ..." [Government Exhibit 5.] Hawkins's crimes were not the result of passion, impulse or a momentary lapse of judgement or control, but, instead, were calculated – he took advantage of those who trusted him.

The Defendant's character and history that he is educated. He was an attorney, investment advisor, certified financial planner, and preacher. He has been gainfully employed most of his adult life. But, despite having professions that are to help people, he defrauded those who trusted him. His motivation, in this crime, was not to help his clients, but to save his own reputation. [R. 57, Trial Tr. Jan. 31, 2023, Page ID 699.] He has little criminal history, but that history does include hitting a police officer in Tennessee. He received treatment after the assault and the conviction was expunged.

4

[PSR ¶¶ 41-49.]  His history also reveals that he is vengeful – after he was convicted, he threatened a witness who testified during the trial.  [R. 45, Motion for Revocation of Release Order; R. 48, Criminal Minutes: Bond Hearing.]

When determining the need for the sentence to be imposed to reflect the seriousness of the offense, to afford adequate deterrence, to protect the public, and to provide the defendant with needed educational training or medical care, one factor can be quickly eliminated from serious consideration – the defendant does not need educational training.  He is highly educated with advanced degrees.

The defendant would benefit, however, from mental health care and anger management.  In the past, the defendant has made poor decisions when he believes he has been aggrieved, and, therefore, causes alarm to those around him.  (The incident in Tennessee and the incident wherein he called a witness after the trial.)  In those moments, the defendant is a danger.  Thus, it is imperative that the defendant receive treatment, in whatever form necessary while incarcerated.

It is important, in this case, that "the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense" and "to afford adequate deterrence to criminal conduct."  18 U.S.C. 3553(a)(2)(A)(B).  Deterrence is important in any fraud offense.  A felony conviction and substantial restitution will offer a measure of deterrence; however, a term of imprisonment, within the guideline range, is necessary to discourage other persons from committing this same offense, to promote respect for the law, and to provide just punishment for the offense.

5

This is a serious offense which has affected the lives of many victims.[1] Victims' lives have been turned upside down by the defendant's actions, and he must be held accountable for his actions. E.T. wrote, in her victim impact statement, this is not a victimless crime and the way in which "this investment was presented was not just an error in judgment equivocating disinformation, but it was an outright lie." This defrauding by the defendant has had a monetary and emotional impact on his victims.

M.B., a widow, states that the money she lost was more than she can afford to lose, and that she needs the money in order to hire home health workers. M.B. fears she will end up broke at a time she most needs the money. [Government Exhibit 17.] Due to the defendant's actions, M.S. and G. M. have lost trust in all investment advisors. [Government Exhibit 19.] P.P., a retired teacher, has had to cancel vacations, is unable to repair a fence, and is unable replace her aging vehicle due to the fraud. The life she worked so hard to make and was looking forward to will now no longer occur due to the defendant's actions, and that this situation has been stressful and depressing. [Government Exhibit 21.] A sentence below the advisory guideline range would unduly depreciate the seriousness of the offense, and would not promote respect for the law, provide just punishment or offer sufficient deterrence.

The Court must also consider "the kinds of sentences available". 18 U.S.C. § 3553(a)(3). Other sentences available may include the imposition of a fine. The Court must determine if a fine is appropriate in this case. The United States agrees that the

---

[1] With this sentencing memorandum, the United States attached 23 statements from victims detailing the harm they have endured due to the defendant's actions.

defendant has a limited ability to pay a fine due to the substantial restitution that is owed. [PSR ¶ 75.] Any monies that the defendant earns should be paid towards the restitution, however, the United States defers to the Court on the appropriate amount of a fine, if any.

Restitution is mandatory, and the United States is asking that restitution be imposed. As of the date of this memorandum, the parties are working to determine the amount of restitution owed. The Court will be notified if an agreement has been met. If the parties cannot come to an agreement by sentencing regarding the restitution, the United States will ask for a date to be set, in the future, to determine the amount of restitution owed.

For the reasons stated above, the Defendant should be sentenced to a period of incarceration within the advisory guideline range and ordered to pay restitution to the victims in this case. The imposition of a fine will be left to the discretion of the Court.

Respectfully submitted,

CARLTON S. SHIER, IV
UNITED STATES ATTORNEY

By:  /s/ Andrea L. Mattingly Williams
Andrea L. Mattingly Williams
William P. Moynahan
Assistant United States Attorney
260 West Vine Street, Suite 300
Lexington, Kentucky 40507
(859) 685-4899
(859) 685-4846
Andrea.Mattingly.Williams@usdoj.gov
William.Moynahan@usdoj.gov

7

## CERTIFICATE OF SERVICE

On May 2, 2023, I electronically filed this document through the ECF system, which will send the notice of electronic filing to counsel of record.

/s/ Andrea L. Mattingly Williams
Assistant United States Attorney